UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TYLER TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO: 4:20-cv-00173-TWP-DML |
| | ) | |
| LEXUR ENTEPRISES INC., ROBERT | ) | |
| FRY, JIMMY DAVIS, JOE | ) | |
| THORNSBERRY, AND JOHN DOES | ) | |
| 1-100 | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

Defendant, Joe Thornsberry ("Thornsberry"), by counsel, submits his Answer to Complaint and Affirmative Defenses.

## INTRODUCTION

1.    Defendants have engaged in a concerted scheme to interfere with the bidding on public works contracts to undermine honest and fair competition in connection with the award of such contracts.

2.    Lexur is a regional competitor of Tyler that worked with Davis and Thornsberry — while both were active Tyler employees with duties of loyalty to Tyler — to secretly arrange for various Indiana counties to rebid work Tyler was actively and successfully performing under contract with each of those counties.  Defendants undertook a series of steps over several weeks to ensure that neither Tyler nor any other competitor would have a full and fair opportunity to bid competitively with Lexur, that Lexur would be granted the bids no matter what, and that Tyler would be terminated mid-contract.   In other words, Defendants orchestrated and

implemented a predetermined rebid process directly intended to undermine the transparent, public bidding that is required for public works contracts (the "Rebid Conspiracy").  Not only is the Rebid Conspiracy an affront to honest and fair competition, but it constitutes an underhanded plot directed squarely at leveraging Tyler's employees and goodwill with its clients for the purpose of destroying those relationships and securing those clients for Lexur's benefit instead. The Rebid Conspiracy is an egregious violation of federal and Indiana antitrust laws and multiple common laws.

3.      As discussed more fully below, Tyler has contracts with a number of Indiana counties for the provision of cyclical reassessment services.  Through these services, Tyler helps counties systematically reassess the value of the property within their jurisdictions to ensure that property taxes are calculated appropriately.

4.      As their name implies, cyclical reassessments occur on a cyclical basis — relevant here, assessments are conducted on four-year cycles, with 25% of the properties within a county reassessed each year.  Counties issue requests for bids for cyclical reassessment contracts in the year prior to a four-year cycle.  Currently, Indiana is in the middle of a four-year cycle scheduled to end in 2022.

5.      Tyler was awarded cyclical reassessment contracts for various Indiana counties for the 2018–2022 cycle.  Tyler has been performing those services in a satisfactory manner and has not received any negative feedback from the counties.  In the ordinary course, bids for the upcoming 2022–2026 cycle would not be solicited until 2021.

6.      In a deviation from the ordinary course, Defendants orchestrated the Rebid Conspiracy, by which a subset of the Indiana counties already under contract with Tyler would issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice,

award new cyclical reassessment contracts to Lexur despite the lack of any competing bids, and terminate their 2018–2022 cyclical reassessment contracts with Tyler in the middle of the contracted-for term.

7. During their employment with Tyler, Davis and Thornsberry were tasked with project roles and served as primary points of contact for the various Indiana counties at issue. Lexur leveraged Davis' and Thornsberry's inside positions at Tyler to execute the scheme at the counties, minimize Tyler's chances of retaining its contracts with those counties, and maximize the likelihood of Lexur obtaining such contracts. By helping Lexur with this scheme, on information and belief, Davis and Thornsberry were promised positions with Lexur to work on the anticipated new contracts.

8. Defendants' unlawful scheme has been somewhat successful. Based on information known to date, Defendants approached six Indiana counties to engage them in this scheme. One rejected the approach. Another issued an out-of-cycle request for bids but, upon reconsideration of the circumstances surrounding its issuance and that only one bid was received (from Lexur), that county decided to issue another request for bids and has yet to award its contract. Yet another county issued an out-of-cycle request for bids and, like the others, received only one bid from Lexur. Upon being informed by Tyler of the very suspicious circumstances surrounding the rebid, however, that county decided to forego entering into a contract with Lexur, and remains under contract with Tyler. The other three counties issued out-of-cycle requests for bids, awarded the contracts to Lexur (the only bidder in each case), and terminated Tyler's 2018–2022 cyclical reassessment contracts mid-term.

9. Due to Defendants' surreptitious activities, three counties have awarded their contracts to Lexur on what is essentially a no-bid basis and, despite the dishonest and unfair

process underlying the rebid, have purported to terminate Tyler's contracts "for convenience" in breach of their contracts with Tyler.

10.     The three lost contracts will deprive Tyler of the remaining value of each of those 2018–2022 contracts, a value that readily approaches the million-dollar mark.  Tyler risks losing even more if any further contracts are terminated as a result of the Rebid Conspiracy (such as the contract currently subject to a second request for bids).  Moreover, Tyler has been forced to expend significant resources to hire counsel to address and ultimately protest the surreptitious bids with each of the implicated counties, including most recently to invoke the dispute resolution processes set out in the cyclical reassessment contracts.  Those costs continue to be incurred, as do costs associated with Tyler's need to file this lawsuit.   And beyond all of the foregoing, Tyler has suffered losses associated with significant disruption to its business as a result of these disturbing circumstances, such as the impact on Tyler employees left with no work because of the sudden, improper termination of the contracts at issue.

11.     The bottom line is that the recent cyclical reassessment awards to Lexur were not the product of an open and honest competition as required by federal and Indiana law.  Instead, those awards arose from a weeks-long (if not longer) conspiracy between Defendants to target the counties by using Davis' and Thornsberry's inside knowledge and goodwill as Tyler employees to set up a veiled and unfair bidding process to ensure Lexur could steal work from Tyler without having to contend with fair contracting and routine competition in the best interests of Indiana taxpayers.

12.     Tyler has been harmed by Defendants' anti-competitive and tortious conduct and is entitled to compensatory damages, treble damages pursuant to the relevant antitrust statutes, costs, and reasonable attorney's fees.  Tyler is further entitled to disgorgement of salary and

other compensation, punitive damages, and lost profits from Davis and Thornsberry in connection with their breach of the duty of loyalty, as well as Thornsberry's breach of his contractual obligations.

**ANSWER:**   Paragraphs 1 through 12, Plaintiff's "Introduction," constitute a general statement of its claims, and as such, a general denial is an appropriate response. *See Fox v. Will County*, No. 04-C-7309, 2011 U.S. Dist. LEXIS 142937, at *7-10 (N.D. Ill. Dec. 7, 2011). Therefore, Thornsberry denies the allegations in paragraphs 1-12.

## PARTIES

13.    Tyler is the largest software company in the nation that focuses solely on providing integrated software and technology services to the public sector.  Tyler has more than 26,000 successful installations across more than 10,000 sites, with clients in all 50 states, Canada, the Caribbean, Australia, and other international locations.  Tyler offers four solution groups, including Public Administration, Courts and Public Safety, K-12 Education, and Transformative Technology.  Within Tyler's Public Administration solutions, Tyler provides solutions for the core functions of government: appraisal, tax collections, records, community development, utility billing, asset maintenance, finance, and administration.  Tyler provides appraisal and tax services to jurisdictions across the country.  Since launching in 1938, Tyler's appraisal and tax business has set the industry standard for integrated tax assessment software and services.  Tyler's experience and expertise are confirmed by, among other things, the market presence it enjoys in Indiana (where Tyler provides services to over twenty Indiana counties).  Tyler is a Delaware corporation with headquarters located at 5101 Tennyson Parkway, Plano, Texas 75024.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 13 and therefore denies the same.

14.     Lexur, acting through its Lexur Appraisal Services operating division, is a regional competitor of Tyler.  Its work has been limited almost exclusively to Ohio.  On information and belief, its recent wins in Indiana as a result of the Rebid Conspiracy represent its first contracts in the state.  Lexur is an Ohio corporation with headquarters located at 7755 Paragon Road, Suite 109, Dayton, Ohio 45459.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 14 and therefore denies the same.

15.     Robert Fry is the President and Chief Financial Officer of Lexur.  On information and belief, Fry was fully aware of, and at least engaged in (if not orchestrated), the Rebid Conspiracy.  On information and belief, Fry currently resides at 6608 Green Park Drive, Dayton, Ohio 45459.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 15 and therefore denies the same.

16.     Davis was employed by Tyler for approximately eleven and a half years.  He resigned on July 6, 2020.  At the time of his resignation, Davis was a Senior Appraisal Projects Supervisor with responsibility over the Indiana counties of Ripley, Floyd, Dearborn, and Jackson.  On information and belief, Davis is either currently working for Lexur or intends to work for Lexur in the near future, with the intention of serving some or all of the counties redirected to Lexur by the Rebid Conspiracy.  On information and belief, Davis currently resides at 736 S. Jackson Park Drive, Seymour, Indiana 47274.

**ANSWER:**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 16 and therefore denies the same.

17.    Thornsberry was employed by Tyler for approximately eleven and a half years. He was terminated on July 21, 2020.  At the time of his termination, Thornsberry was an Associate Project Supervisor with responsibility over the Indiana counties of Jefferson and Switzerland.  On information and belief, Thornsberry is either currently working for Lexur or intends to work for Lexur in the near future, with the intention of serving some or all of the counties redirected to Lexur by the Rebid Conspiracy.  On information and belief, Thornsberry currently resides at 7833 E. Brushy Fork Road, Madison, Indiana 47250.

**ANSWER:**    Thornsberry denies that he is either currently working for Lexur or intends to work for Lexur in the near future, with the intention of serving some or all of the counties redirected to Lexur by the Rebid Conspiracy. Thornsberry admits the remaining allegations in paragraph 17.

18.    The true identity of the John Does is currently unknown.  Tyler believes that other individuals or entities encouraged, assisted, or supported Defendants in their anti-competitive scheme to restrict bidding on public works contracts and to tortiously interfere with Tyler's contractual and business relationships.  Tyler believes that information obtained in discovery will lead to the identification of the John Does.

**ANSWER:**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 18 and therefore denies the same.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Lexur because Lexur has conducted or solicited business in Indiana that has given rise to Tyler's claims, has committed tortious and illegal acts in Indiana, and has maintained continuous and systematic contacts within Indiana.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 19 and therefore denies the same.

20.     This Court has personal jurisdiction over Fry because, at all relevant times, Fry has served as the President and Chief Financial Officer of Lexur, has conducted or solicited business in Indiana on Lexur's behalf that has given rise to Tyler's claims, and has committed tortious and illegal acts in Indiana.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 20 and therefore denies the same.

21.     This Court has personal jurisdiction over Davis and Thornsberry because Davis and Thornsberry are Indiana residents, have conducted or solicited business in Indiana that has given rise to Tyler's claims, have committed tortious and illegal acts in Indiana, and have breached duties in Indiana.

**ANSWER:**     Thornsberry admits that the Court has personal jurisdiction over Thornsberry because he is an Indiana resident, but otherwise denies the allegations in paragraph 21.

22.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Tyler's claim against Defendants under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, raises a federal question.  Pursuant to 28 U.S.C. § 1367, Tyler's remaining claims fall within this Court's supplemental jurisdiction because they are so related to the federal claim that they form part of the same case or controversy.

**ANSWER:** Thornsberry denies that Plaintiff has pleaded a substantial claim under federal law, and therefore denies the jurisdictional allegations in paragraph 22.

23.     This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:** Thornsberry admits the jurisdictional allegations in paragraph 23.

24.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to this dispute occurred within this District.

**ANSWER:** Thornsberry admits the allegations in paragraph 24.

## FACTUAL BACKGROUND

**I.     Tyler's 2018–2022 cyclical reassessment contracts with various Indiana counties.**

25.     Under Indiana law, Indiana County Assessors are required to physically inspect and reassess the value of all real property within their county over the course of four years. During each year of a four-year cycle, 25% of properties within the county are reassessed. Once all of the properties within a county have been reassessed, a new four-year cycle begins. This process is commonly known as a "cyclical reassessment."

**ANSWER:** Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 25 and therefore denies the same.

26.     Indiana County Assessors regularly engage private contractors to provide support and advice in connection with cyclical reassessments. To engage such contractors, Indiana County Assessors are required by Indiana law to advertise for bids. Bids are typically solicited in the year prior to the start of a new four-year cycle.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 26 and therefore denies the same.

27.     The current cyclical reassessment period started on May 1, 2018, and is scheduled to end on April 30, 2022.  Relevant here, the Indiana counties of Dearborn, Floyd, Jackson, Jefferson, Ripley, and Switzerland (collectively, the "Counties") each solicited bids for such 2018–2022 cycle in the late spring of 2017.  Tyler submitted bids in response to the Counties' 2017 solicitations and was ultimately awarded the work for each of the Counties.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the same.

28.     Notably, Lexur also submitted bids in response to at least some of the Counties' 2017 solicitations but was not awarded any contracts. On information and belief, Lexur lost each bid it submitted in part due to Lexur's complete lack of experience providing assessment services in Indiana.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 28 and therefore denies the same.

29.     After winning the work, Tyler entered into cyclical reassessment contracts with each of the Counties in the summer of 2017 (the "2017 Tyler Contracts" or the "Contracts").

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 29 and therefore denies the same.

30.     Apart from pricing, the 2017 Tyler Contracts are essentially identical due to the fact that Indiana mandates the use of a prescribed form for all cyclical reassessment contracts.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 30 and therefore denies the same.

31.     Under the terms of the 2017 Tyler Contracts, a County can only terminate such a contract for convenience if termination is in the County's "best interest."   Additionally, a County's termination of services for convenience must be "effected by delivery to [Tyler] of a Termination Notice at least thirty days prior to the termination effective date specifying the extent to which performance of services under such termination becomes effective."   Further, Tyler must be "compensated for services properly rendered prior to the effective date of termination."

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 31 and therefore denies the same.

32.     Tyler fully performed its obligations under the 2017 Tyler Contracts.  Indeed, the Counties conducted quarterly reviews of Tyler's services and Tyler did not receive any negative feedback at any time.  In fact, Davis was responsible for reporting the Counties' feedback to Tyler and never indicated to Tyler that the Counties were dissatisfied with Tyler's services.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 32 and therefore denies the same.

**II.     Tyler employees Davis and Thornsberry were responsible for the Counties.**

33.     Davis started work for Tyler on January 29, 2009.  He was promoted to Senior Appraisal Projects Supervisor on or about February 21, 2015.  From at least February 21, 2015 through July 6, 2020, Davis had responsibility over four of the Counties — Ripley, Dearborn, Floyd, and Jackson.  During this same time, Davis also had responsibility over the other two Counties — Switzerland and Jefferson — until responsibility for those two counties transferred to Thornsberry on February 15, 2020.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 33 and therefore denies the same.

34.   Thornsberry started work for Tyler on April 13, 2009.  From approximately February 2015 to February 15, 2020, reporting to Davis, Thornsberry was assigned to perform work for two of the Counties — Switzerland and Jefferson.  He was promoted to Associate Project Supervisor on or about February 15, 2020, and became the primary project manager responsible for those Counties, through July 10, 2020.

**ANSWER:**   Thornsberry admits the allegations in paragraph 34.

35.   In connection with his most recent promotion, on March 4, 2020, Thornsberry entered into two written agreements with Tyler.  The first was memorialized in his offer letter and contained certain restrictive covenants (the "Restrictive Covenant Agreement").  A true and accurate copy of the Restrictive Covenant Agreement is attached as Exhibit A.

**ANSWER:**   Thornsberry admits the allegations in paragraph 35.

36.   Pursuant to the Restrictive Covenant Agreement's terms, Thornsberry agreed to the following (among other things):

> [F]or the one-year period following the termination of [Thornsberry's] employment, for any reason, [Thornsberry] shall not (a) contact, call upon, solicit, or perform services competitive with those of Tyler as to any customer of Tyler for whom [Thornsberry] provided services or solicited, called on, or marketed on behalf of Tyler during the final two years of [Thornsberry's] employment with Tyler, or (b) recruit, solicit or hire, or encourage or assist other persons or entities to recruit, solicit or hire, any employees of Tyler.

Exhibit A at 2.

**ANSWER:**   Thornsberry admits the allegations in paragraph 36.

37.   Thornsberry's second agreement was a stand-alone Confidentiality Agreement, which Thornsberry similarly executed on March 4, 2020.   The Confidentiality Agreement

required Thornsberry, among other things, to maintain and protect Tyler's confidential information before and after his employment.

**ANSWER:**   Thornsberry admits the allegations in paragraph 37.

38.    Tyler requires its employees to review and acknowledge the Tyler Employee Handbook on an annual basis.  Most recently, Davis and Thornsberry both acknowledged receiving and reviewing Tyler's 2020 Employee Handbook on May 7, 2020.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 38 and therefore denies the same.

39.    Among other things, by acknowledging Tyler's 2020 Employee Handbook, Davis and Thornberry agreed and acknowledged as follows:

a.    Tyler expects the undivided loyalty of its employees in the conduct of business.  It is important that employees be free from any financial interests or other relationships that might conflict with the best interests of Tyler.  Accordingly, each employee shall avoid any investment or other interest in any business that would conflict with the proper performance of their duties or responsibilities for Tyler, or which might interfere with their independence of judgment with respect to the transactions between Tyler and such other business.

b.    Tyler expects all officers, directors, and employees to exercise the highest degree of professional business ethics in all actions they undertake on behalf of Tyler.

c.    The use of any Tyler assets for any unlawful or improper purpose is strictly prohibited.

d.    The use of Tyler employees, materials, or equipment for personal purposes is strictly prohibited, unless specifically authorized.

e.    Tyler's employees, clients, vendors, and shareholders entrust [Tyler] with certain confidential information relating to their business activities.  The nature of this relationship requires Tyler employees to strictly comply with their confidentiality obligations, even after they leave employment with Tyler.

f.    As an employee, you have a responsibility to avoid unnecessary and/or impermissible disclosure of confidential, proprietary information about Tyler, its clients, and/or its vendors.

g.      You are not to discuss with the officers, directors, or employees of competing companies any topic that might give the impression of an illegal agreement in restraint of trade.  Such topics include, but are not limited to, pricing agreements, client allocation, and division of sales territories.

h.      Under no circumstances should confidential information be disclosed or revealed within or outside the company without proper authorization or for a permitted purpose.

**ANSWER:**      Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 39 and therefore denies the same.

III.    **Lexur and Fry — with Davis' and Thornsberry's inside Tyler knowledge and goodwill with the Counties — execute the Rebid Conspiracy.**

a.      *Planning the Rebid Conspiracy*

40.     On information and belief, Lexur and Fry were working with Davis and/or Thornsberry, and possibly others, for well over a month to prepare for, plan, and implement the Rebid Conspiracy.

**ANSWER:**      Thornsberry denies the allegations in paragraph 40.

41.     Although Davis and Thornsberry were Tyler employees with contractual and/or common law duties to Tyler, they agreed to engage in these efforts to help Lexur and damage Tyler right under Tyler's nose, using Tyler's goodwill and relationships with the Counties to implement the Rebid Conspiracy.

**ANSWER:**      Thornsberry denies the allegations in paragraph 41.

42.     In or about May 2020, Davis — *as a Tyler employee* — called the Jackson County Assessor ("Jackson Assessor") and asked if Jackson County would be willing to rebid its cyclical reassessment contract mid-cycle.  Davis also indicated that he was looking to leave Tyler and join another company (Lexur).  In other words, Davis reached out to his contact in Jackson County — a relationship developed for Tyler and at Tyler's expense — to ask her to

14

rebid the contract and give the work to a competitor that he hoped to join.  The Jackson Assessor rejected the idea of rebidding the contract.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 42 and therefore denies the same.

43.     Around the same time as Davis' solicitation of Jackson County on Lexur's behalf, Fry and Davis had a telephone call.  As there is no logical reason why Davis — a Tyler employee — would be talking with the President of a competitor around the same time he was trying to convince Tyler clients to jump ship to that same competitor, Tyler believes that discovery will confirm that this call was about planning and implementing the Rebid Conspiracy.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 43 and therefore denies the same.

44.     Following the Jackson Assessor's rejection of Defendants' proposal, Defendants continued to solicit the Counties as part of the Rebid Conspiracy.  On information and belief, the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn engaged with Defendants' outreach, at least initially, as evidenced by early written documentation of the Rebid Conspiracy.

> **ANSWER:**   Thornsberry denies the allegations in paragraph 44.

45.     Specifically, as early as June 2, 2020, Defendants had committed the Rebid Conspiracy to writing.  On that date, Davis sent an email from his personal email address (jdavisdsl@frontier.com)          to          Thornsberry's          personal          email          address (shanethornsberry@gmail.com) attaching (1) a calendar outlining the timeline of events for the Rebid Conspiracy (the "Calendar"), and (2) a draft termination notice for the Counties to send to Tyler to terminate their respective contracts (the "Draft Termination Notice").  A true and accurate copy of the June 2, 2020 email with its attachments is attached as Exhibit B.

**ANSWER:** Thornsberry denies that as early as June 2, 2020, Defendants had committed the Rebid Conspiracy to writing. Thornsberry admits that Exhibit B contains a copy of an emails sent from Davis's personal email address to Thornsberry's personal email address. Thornsberry denies the remaining allegations in paragraph 45.

46. The Calendar specifically referenced the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn, and provided a day-by-day plan for the Rebid Conspiracy: the Counties' short-notice and minimally publicized release of the request for bids right before and/or directly over the Fourth of July holiday; the intentional scheduling of the close of bids to occur immediately or just before the next regularly scheduled county commissioners meetings (at which Lexur would be awarded the contracts as the only bidder and Tyler termination notices would be signed); termination of Tyler's contracts with the Counties; the resignation of "all Staff" at Tyler working on the Counties' projects and "All Activities" on those Counties halted; the subsequent transition of that Tyler staff to Lexur; and Lexur to pick up operations on the Counties under their new contracts.

**ANSWER:** Thornsberry denies involvement in the Rebid Conspiracy and is otherwise without sufficient information to form a belief as to the remaining allegations in paragraph 46 and therefore denies the same.

47.     The Calendar quite literally speaks for itself:

| 2020 | JULY | | | | SUNDAY | |
|------|------|---|---|---|--------|---|
| CALENDAR YEAR | CALENDAR MONTH | | | | | |

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 28 | 29 | 30 | 01 | 02 | 03 | 04 |
| | Counties advertise for support services | | | | | |
| 05 | 06 **Submit All Bids** Switzerland 5PM | 07 **Dearborn 9AM Jackson 6PM** | 08 | 09 **Jefferson 5PM** | 10 | 11 |
| 12 | 13 **Ripley 8AM** | 14 | 15 | 16 **Floyd 4:30 PM** | 17 **Send All Termination Notices** | 18 |
| 19 | 20 **All Activities Halted All Staff Resign** | 21 | 22 Transition Staff To Lexur | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 Resume Production Operations | 30 | 31 | 01 |

Counties 5 day advertising period
Commissioner's meetings: Sign termination notifications & award new contract
Terminations: Overnight Registered/Certified to Mark Hawkins, President, Appraisal & Tax Division, 5101 Tennyson Parkway, Plano, Texas 75024
Resignations: All staff effectively immediately.

**ANSWER:**     Thornsberry admits that the picture contained in Exhibit B is replicated in paragraph 47. Thornsberry denies the remaining allegations in paragraph 47.

48.     On information and belief, Lexur and Fry were driving forces behind the plan outlined in the Calendar.   Each aspect of the Rebid Conspiracy outlined in the Calendar necessarily involved Lexur — being prepared for the otherwise secretive rebid, preparing its own bid, attending the county commissioner meetings to be awarded the contracts, and ultimately hiring Davis, Thornsberry, and "All Staff" from Tyler.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 48 and therefore denies the same.

49.     Davis in particular was an integral asset to Lexur and Fry.   As reflected by its file properties, Davis himself authored the Calendar:



**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 49 and therefore denies the same.

50.   The Draft Termination Notice circulated by and between Davis and Thornsberry on June 2, 2020 was also a key component of the Rebid Conspiracy.  That Draft Termination Notice was ultimately used by certain of the Counties to terminate the 2017 Tyler Contracts.  It too was authored by Davis:



**ANSWER:**   Thornsberry denies that he was involved in the Rebid Conspiracy and is without sufficient information to form a belief as to truth of the remaining allegations in paragraph 50 and therefore denies the same.

51.   With the Calendar and Draft Termination Notice in the works, and the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn in play, Defendants were well on their way to implementing the Rebid Conspiracy.

**ANSWER:**   Thornsberry denies the allegations in paragraph 51.

52.   Defendants even tried again to persuade Jackson County to engage in the Rebid Conspiracy.   On June 8, 2020, Jennifer Bippus ("Bippus"), a Lexur employee, sent an email to the Jackson Assessor asking if she was available for a meeting on the afternoon of June 9, 2020. Bippus also stated that she would be "visiting Shawna [Shawna Bushhorn, Ripley County Assessor] and possibly Switzerland county" on the morning of June 9, 2020.   Tyler believes that discovery will confirm that Bippus wished to meet with the assessors of Jackson County, Ripley County, and Switzerland County to further the Rebid Conspiracy.

**ANSWER:**   Thornsberry denies involvement in the Rebid Conspiracy and is without sufficient information to form a belief as to the truth of the remaining allegations in paragraph 52 and therefore denies the same.

53.   The Jackson Assessor did not respond to Bippus' June 8, 2020 email, but Defendants were not dissuaded.   Davis subsequently called the Jackson Assessor *on Lexur's behalf* (while still a Tyler employee!) and asked her to meet with Bippus.   The Jackson Assessor rejected Davis' request once again and said that she was not interested in meeting with Lexur.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 53 and therefore denies the same.

54.   Further communications between and among Defendants and/or the Counties over the next week reflect the continued refinement of the Rebid Conspiracy.

**ANSWER:**   Thornsberry denies the allegations in paragraph 54.

55.   On June 15, 2020, Davis sent an email (again from his personal email address) to Thornsberry (again at his personal email address) attaching (1) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Switzerland County, (2) a draft request for cyclical reassessment bids for Switzerland County, (3) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Jefferson County, and (4) a draft request for cyclical reassessment bids for Jefferson County.   In that email, Davis asked Thornsberry to "carefully review [the email's attachments] for any error [*sic*] or omissions":

| From: | Shane Thornsberry <shanethornsberry@gmail.com> |
| Sent: | Wednesday, June 17, 2020 11:29 AM |
| To: | Thornsberry, Shane |
| Subject: | Fwd: jeff plan calendar |
| Attachments: | REBID - Switzerland 2022 Cyclical Reassessment_Notice to Bidders.doc; REBID - Switzerland County IN 2022 Cyclical Reassessment RFB.doc; REBID - Jefferson 2022 Cyclical Reassessment_Notice to Bidders.doc; REBID - Jefferson County IN 2022 Cyclical Reassessment RFB.doc |

---------- Forwarded message ----------
From: **Jim Davis** <jdavisdsl@frontier.com>
Date: Monday, June 15, 2020
Subject: jeff plan calendar
To: Shane Thornsberry <shanethornsberry@gmail.com>

Shane,

Please carefully review these for any error or omissions.

Notes:

1.) All totals are as of 6/5

2.) Data entry has been omitted from Jefferson for cost reduction

3.) Performance retainer in lieu of bond for cost reduction

4.) Increased parcel count due to adding unimproved parcels yields a decreased price per parcel.

As evidenced by the attachments' file properties, Davis authored the four attachments. The draft notices to bidders for Switzerland County and Jefferson County attached to the email both state that bids will be accepted until July 6, 2020, which is the same day the Calendar identifies as the deadline to "Submit All Bids."

> **ANSWER:**    Thornsberry admits that on June 15, 2020, Davis sent an email from his personal email address to Thornsberry's personal email address and that the content of that email is replicated in paragraph 55. Thornsberry denies the remaining allegations in paragraph 55.

56.    Davis also sent an email from his personal email address to the Ripley County Assessor, Shawna Bushhorn, on June 15, 2020 attaching (1) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Ripley County and (2) a draft request

for cyclical reassessment bids for Ripley County.  The draft notice states that bids will be accepted until "10:00 A.M. EST the 1st [sic] of July 6, 2020[.]," once again consistent with the Calendar.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 56 and therefore denies the same.

57.   On June 16, 2020, Davis sent another email from his personal email address to the Ripley County Assessor.  This email attached (1) a revised draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Ripley County and (2) a revised draft request for cyclical reassessment bids for Ripley County.  In this set, Davis corrected the typographical error referenced in the preceding paragraph, such that the revised draft notice attached to the June 16 email states that bids will be accepted until "10:00 A.M. EST July 6, 2020[.]"

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 57 and therefore denies the same.

58.   The foregoing emails and attachments reflect that Davis and Thornsberry actively drafted the very notices and requests for bids that the Counties were to issue in order to surreptitiously rebid cyclical reassessment services while their contracts with Tyler were mid-cycle, as well as the termination notices that the Counties were to issue later upon awarding the contracts to Lexur and terminating Tyler mid-contract.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 58 and therefore denies the same.

**b.**   ***Executing the Rebid Conspiracy: The Counties Issue Requests for Bids and Lexur is the Sole Bidder***

59.     Shortly before the Fourth of July holiday (which is the time period identified in the Calendar as "Counties advertise for support services"), Jefferson, Ripley, Switzerland, Floyd, and Dearborn Counties issued (1) notices to bidders for the out-of-cycle rebid of cyclical reassessment services, and (2) requests for cyclical reassessment bids.  These documents are nearly identical to the draft documents authored by Davis and sent on to the Counties.

**ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 59 and therefore denies the same.

60.     While Lexur had advance notice of the rebids (as orchestrator of the Rebid Conspiracy working directly with Davis, Thornsberry, and the Counties), the Counties did not provide Tyler with any advance notice of their intention to solicit bids.  With no reason to be monitoring local papers for out-of-cycle bid notices on the contracts Tyler was successfully performing for the Counties, Tyler only learned of the rebids indirectly and, as designed, without sufficient time or context to submit a bid.  Indeed, bidding had already closed in two of the Counties by the time Tyler learned of the solicitations themselves.

**ANSWER:**     Thornsberry denies involvement in the Rebid Conspiracy. Thornsberry is without sufficient information to form a belief as to the truth of the remaining allegations in paragraph 60 and therefore denies the same.

61.     After learning of one of the rebids, Tyler naturally asked Davis, who was responsible for the Counties on Tyler's behalf, if he had any idea that they were planning to rebid.  Davis denied any such knowledge, despite that it is now clear that he personally authored the notices and requests for bids themselves.  Davis' deceit further delayed Tyler's confirmation that the rebid process was underway, but Tyler's concerns regarding the state of the Contracts continued and Tyler determined to reach out directly to the Counties to inquire as to what was

going on (through someone other than Davis, the typical point of contact for Tyler on those Counties).  The Counties (except for Dearborn County) ignored Tyler's inquiries.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 61 and therefore denies the same.

62.     The Rebid Conspiracy successfully eliminated any chance that Tyler would have sufficient notice and lead time to prepare a meaningful bid in the very short window provided even initially, much less in the very limited time remaining (if any) by the time Tyler learned of the solicitations.

> **ANSWER:**   Thornsberry denies the allegations in paragraph 62.

63.     Depending on the County, bids were due on different dates during the first week of July, all coinciding with the Calendar's identification of July 6, 2020 as the model deadline to "Submit All Bids."

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 63 and therefore denies the same.

64.     With the timing so carefully planned to eliminate any competition, Lexur was the sole bidder for each of the cyclical reassessment contracts rebid by the Counties.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 64 and therefore denies the same.

65.     On July 6, 2020, the very day the Calendar identifies as the deadline for bid submissions, Davis resigned from Tyler.  On information and belief, Davis has since started working for Lexur, or intends to start working for Lexur in the near future.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 65 and therefore denies the same.

      ***c.***     ***Executing the Rebid Conspiracy: Jefferson, Ripley, and Switzerland Counties enter into new contracts with Lexur, and terminate their 2017 Tyler Contracts using Defendants' Draft Termination Notice***

66.     Switzerland County, Jefferson County, and Ripley County held Board of Commissioners meeting on July 6, 2020; July 9, 2020; and July 13, 2020, respectively. These are the same dates identified on the Calendar.

    **ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 66 and therefore denies the same.

67.     During each of these meetings, the respective County Board of Commissioners approved the termination of the County's 2017 Tyler Contract, and further approved entering into a new cyclical reassessment contract with Lexur. Interestingly, Fry signed the contracts with Jefferson County and Ripley County on behalf of Lexur on July 6, 2020, *even before they were approved by the respective County Board of Commissioners*.

    **ANSWER:**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 67 and therefore denies the same.

68.     On July 9, 2020, a few days before the Ripley County meeting, Davis (through his personal email address) and the Ripley County Assessor exchanged emails regarding use of the Draft Termination Notice to terminate Tyler's cyclical reassessment contract with Ripley County. In the email exchange, the Ripley County Assessor asked Davis for his advice on the Draft Termination Notice's language. In response, Davis proposed the following language: "All activities currently underway are to cease immediately and a final bill for services performed prior to date of this notice is to be issued within 30 days." This language was ultimately included word-for-word in the Ripley County termination notice that was sent to Tyler. A true

and accurate copy of the July 9, 2020 email exchange between Davis and the Ripley County Assessor is attached as <u>Exhibit C</u>.

> **<u>ANSWER:</u>**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 68 and therefore denies the same.

69.    After learning that the Switzerland, Jefferson, and Ripley County Board of Commissioners had granted contracts to Lexur, Tyler sent letters to each of those Counties on July 15, 2020, protesting the issuance of what were effectively no-bid contracts.

> **<u>ANSWER:</u>**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 69 and therefore denies the same.

70.    None of those Counties meaningfully responded to Tyler's letters and each of them instead sent letters to Tyler purportedly terminating for convenience their respective contracts with Tyler.  True and accurate copies of the Jefferson County Termination Notice, Ripley County Termination Notice, and Switzerland County Termination Notice (collectively, the "Termination Notices") are attached as <u>Exhibits D, E, and F</u>, respectively.

> **<u>ANSWER:</u>**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 70 and therefore denies the same.

71.    The Termination Notices and the Draft Termination Notice authored and circulated by and between Davis and Thornsberry some weeks earlier are nearly identical.  In fact, the Termination Notices and the Draft Termination Notice all include the same typographical error —  the word "has" is improperly used twice in the first sentence in each notice:

**Draft Termination Notice:**

Be advised, you are hereby notified that Ripley County has, in accordance with provision 27 of the 2022 Ripley County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Jefferson County Termination Notice:**

Be advised, you are hereby notified that Jefferson County has, in accordance with provision 27 of the 2022 Jefferson County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Switzerland County Termination Notice:**

Be advised, you are hereby notified that Switzerland County has, in accordance with provision 27 of the 2022 Switzerland County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Ripley County Termination Notice:**

Please be advised, you are hereby notified that Ripley County Indiana has, in accordance with provision 27 of the 2022 Ripley County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

Compare Exhibit B with Exhibits D–F.  This is not a coincidence.

**ANSWER:**     Thornsberry denies involvement in the Rebid Conspiracy. Thornsberry is without sufficient information to form a belief as to the remaining allegations in paragraph 71 and therefore denies the same.

72.     The Jefferson County Termination Notice and Switzerland County Termination Notice are both dated July 17, 2020, despite the fact that they were signed by the relevant county assessors and commissioners earlier in July at the respective county meetings.  See Exhibits D and F.  This too comes directly from the Draft Termination Notice, which was dated July 17, 2020 (consistent with the Calendar).  See Exhibit B.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 72 and therefore denies the same.

73.   The Termination Notices constitute breaches of those Counties' respective contracts with Tyler.  As a preliminary matter, the Contracts permit termination for convenience only when it would be in the "best interest" of the Counties.  Entering into new contracts with Lexur — on information and belief, an entity with zero experience in Indiana that was rejected in 2017 for that very reason — on what is essentially a no-bid basis that was manipulated through a surreptitious scheme is objectively not in the "best interest" of the Counties.  Tyler is an industry leader that provides high-quality services to over twenty Indiana counties, and has performed all of its obligations under the relevant contracts with Jefferson County, Ripley County, and Switzerland County in a satisfactory fashion for at least two years.  None of these Counties raised concerns or complaints regarding Tyler's services prior to sending the Termination Notices.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 73 and therefore denies the same.

74.   To the extent that pricing is claimed by the Counties as a driving force for issuing out-of-cycle requests for bids, that does not explain why it was done: (i) with no prior notice to Tyler before being published in minimally circulated local papers, (ii) shortly before the Fourth of July holiday, and (iii) with a very short turnaround for bids.  All of those things *minimize* the chances of obtaining the best possible price because it is highly unlikely that potential bidders, such as Tyler, would have even been aware of the requests for bids in time to submit a proposal (and, of course, Tyler was not).  In other words, the timing of the requests for bids all but guaranteed that the process would not be competitive and, as such, unequivocally is *not* in the

Counties' best interest.  Moreover, since the 2017 Tyler Contracts are publicly available, it is not at all surprising that Lexur's proposed pricing was less than the pricing in the 2017 Tyler Contracts; Lexur knew Tyler's pricing and was the only party able to bid.  Of course it bid lower — it knew exactly what number it needed to beat (if only marginally).

**ANSWER:**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 74 and therefore denies the same.

75.    Underscoring the impropriety of the Rebid Conspiracy, two of the Counties targeted by Defendants, Dearborn and Floyd, have hesitated to terminate Tyler's contract and award the work to Lexur.  Dearborn County was at first pulled into Defendants' Rebid Conspiracy and issued an out-of-cycle request for bids but, on reconsideration of the circumstances surrounding its issuance and that Lexur was the only entity to submit a bid, decided to issue a second request for bids.  Tyler, by then on notice that such an out-of-cycle bid was expected from Dearborn, was able to submit a bid in response to that second request (Lexur submitted another bid as well).  Dearborn County is still considering the bids it received.

**ANSWER:**    Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 75 and therefore denies the same.

76.    Regarding Floyd County, its Board of Commissioners meeting took place on July 21, 2020, as indicated by the Calendar.  Because this was the latest of Defendants' scheduled meetings on the Calendar, and came after Davis' resignation and Tyler beginning to learn of the Rebid Conspiracy, Tyler was able to send Floyd County a letter protesting the bid in advance of that meeting, laying out many of the facts contained herein.  With that information, at the meeting, Floyd County's Board of Commissioners was skeptical of the circumstances surrounding the rebid process and instructed that it be taken under advisement.  Floyd County

has recently determined that it will not award a contract to Lexur, and its 2017 Tyler Contract remains in effect.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 76 and therefore denies the same.

77.    Jefferson, Ripley, and Switzerland Counties also breached their respective contracts with Tyler by requesting Tyler to cease work "immediately."  As discussed above, the 2017 Tyler Contracts require the Counties to provide notice of termination "at least thirty days prior to the termination effective date."  Then, until the "termination effective date," Tyler is entitled to continue rendering its services and be paid for those services.  Specifically, the Counties must compensate Tyler for all services it renders "prior to the effective date of termination," which includes those services rendered after it received the notice of termination.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 77 and therefore denies the same.

> ***d.    Various Tyler Employees are solicited or hired by Lexur and Fry, or otherwise leave Tyler as a result of the Rebid Conspiracy***

78.    On information and belief, Lexur was the architect of the Rebid Conspiracy, which is illustrated by its parallel efforts to secure the Tyler staff it would need to meet the needs of the anticipated contracts it would soon be awarded through execution of the conspiracy.  As noted above, the Calendar dictated that "All Staff" at Tyler would resign and then transition to Lexur.

**ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 78 and therefore denies the same.

79.     Tyler has employed seven full-time employees assigned to the Counties.   Of them, as of the date of this filing, three have left — or are imminently leaving — Tyler as a result of the Rebid Conspiracy:

      a.      Davis resigned on July 6, 2020 and, on information and belief, is either currently working for Lexur or intends to work for Lexur in the near future, with the intention of serving some or all of the Counties.

      b.      Thornsberry was terminated on July 21, 2020 (following Tyler's discovery of his involvement in the Rebid Conspiracy), and, on information and belief, is either currently working for Lexur or intends to work for Lexur in the near future, with the intention of serving some or all of the Counties.

      c.      Another Tyler employee assigned to one of the Counties that has now terminated its 2017 Tyler Contract issued a resignation to Tyler on August 7, 2020.  On information and belief, this employee's resignation is a direct result of the Rebid Conspiracy.

**<u>ANSWER:</u>**     Thornsberry admits that he was terminated on July 21, 2020 and denies the remaining allegations in paragraph 79(b). Thornsberry is without sufficient information to for a belief as to the truth of the remaining allegations in paragraph 79 and therefore denies the same.

80.     Tyler has learned that at least two more of the seven employees assigned to the Counties have been actively solicited by Defendants to join Lexur.

**<u>ANSWER:</u>**     Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 80 and therefore denies the same.

81.     For example, Fry approached at least one Tyler employee regarding an opportunity to work with Lexur on the anticipated new contracts with certain of the Counties. Fry indicated that he expected work for certain of the Counties to be shifting from Tyler to Lexur.  On information and belief, Fry also used inside information about Tyler compensation in

his efforts to solicit Tyler employees — information he could only have received through Davis and/or Thornsberry.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 81 and therefore denies the same.

82.   Another employee was solicited by Davis (while he was still working for Tyler!) to join Lexur.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 82 and therefore denies the same.

83.   Tyler believes that discovery will show other employment offers being made to the Tyler staff associated with the Counties, consistent with the Calendar's instruction that "All Staff" were to resign from Tyler and then transition to Lexur.

> **ANSWER:**   Thornsberry is without sufficient information to form a belief as to the truth of the allegations in paragraph 83 and therefore denies the same.

**IV.   Defendants' unlawful Rebid Conspiracy has harmed Tyler.**

84.   As of this filing, Defendants' anti-competitive scheme and tortious activities have caused Tyler to lose its cyclical reassessment contracts with Jefferson County, Ripley County, and Switzerland County.  Tyler has been forced to expend significant resources to hire counsel to protest Lexur's bids with each of these counties, which has included invoking the dispute resolution processes set out in the Contracts.  Given the significant harm caused by Defendants, Tyler is, at a minimum, entitled to recover compensatory damages, punitive damages, treble damages, reasonable attorney's fees, and the costs it incurs in connection with this proceeding.

> **ANSWER:**   Thornsberry denies the allegations in paragraph 84.

85.   Defendants' misconduct has also jeopardized other Tyler contracts and business relationships.  Most notably, there is a risk of Tyler losing its cyclical reassessment contracts

with Dearborn County and, albeit to a lesser extent now, Floyd County.  While these counties have not terminated Tyler's contracts for the time being, Defendants' Rebid Conspiracy has, at a minimum, strained Tyler's relationship with such counties.

**ANSWER:**    Thornsberry denies the allegations in paragraph 85.

86.    Regarding Davis and Thornsberry, rather than devoting their time and energy to furthering Tyler's interests, they chose to surreptitiously collude with a Tyler competitor.  The scheme began while Davis and Thornsberry were still Tyler employees, using Tyler time and resources.  Tyler is, at a minimum, entitled to recover any salary or other compensation it provided to Davis or Thornsberry while they were conspiring against Tyler.  And, given the audacity and depth of this scheme, punitive damages are entirely appropriate.

**ANSWER:**    Thornsberry denies the allegations in paragraph 86.

## COUNT I: VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 1, *et seq.*)
**(against all Defendants)**

87.    Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**    Thornsberry incorporates his responses to paragraphs 1-87.

88.    Defendants violated 15 U.S.C. § 1 by, among other things, encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2017 Tyler Contracts, and to award the cyclical reassessment contracts to Lexur as the sole bidder.

**ANSWER:**    Thornsberry denies the allegations in paragraph 88.

89.     Through the above-described conspiracy, Defendants restrained competition for public works contracts by reducing the number of potential bidders and rigging the result of the bidding process.   As a result, Defendants have unreasonably restricted free competition in violation of the Sherman Act.

**ANSWER:**     Thornsberry denies the allegations in paragraph 89.

90.     Defendants' anti-competitive conspiracy has affected interstate commerce.   Tyler is a Delaware corporation with headquarters located in Texas.   Lexur is an Ohio corporation with headquarters located in Ohio.   Davis and Thornsberry reside in Indiana.   The Counties are located in Indiana and the cyclical reassessment contracts at the heart of the conspiracy involve services to be performed in Indiana.

**ANSWER:**     Thornsberry denies the allegations in paragraph 90.

91.     Defendants' conduct directly and proximately caused Tyler to lose its cyclical reassessment contracts with Jefferson County, Ripley County, and Switzerland County.   Tyler also stands to lose additional contracts due to Defendants' collusion, including but not limited to tyler's cyclical reassessment contracts with Dearborn County and Floyd County.

**ANSWER:**     Thornsberry denies the allegations in paragraph 91.

92.     As a direct and proximate result of Defendants' collusion, Tyler has been, and will continue to be, irreparably harmed, and has suffered monetary damages in an amount to be determined at trial.

**ANSWER:**     Thornsberry denies the allegations in paragraph 92.

93.     Pursuant to 15 U.S.C. § 15, Tyler is entitled to treble damages, the costs it incurs in connection with this proceeding, and reasonable attorney's fees.

**ANSWER:**     Thornsberry denies the allegations in paragraph 93.

## COUNT II: VIOLATION OF THE INDIANA ANTITRUST ACT
### (Ind. Code § 24-1-2-1, *et seq.*)
**(against all Defendants)**

94.     Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**     Thornsberry incorporates his responses to paragraphs 1-94.

95.     Defendants violated Ind. Code § 24-1-2-3 by, among other things, encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2017 Tyler Contracts, and to award the cyclical reassessment contracts to Lexur as the sole bidder.

**ANSWER:**     Thornsberry denies the allegations in paragraph 95.

96.     Through the above-described conspiracy, Defendants have restrained and restricted bidding for public work contracts by reducing the number of potential bidders and rigging the result of the bidding process.  As a result, Defendants have restricted free competition in violation of Indiana law.

**ANSWER:**     Thornsberry denies the allegations in paragraph 96.

97.     Defendants' conduct directly and proximately caused Tyler to lose its cyclical reassessment contracts with Jefferson County, Ripley County, and Switzerland County.  Tyler also stands to lose additional contracts due to Defendants' collusion, including but not limited to its cyclical reassessment contracts with Dearborn County and Floyd County.

**ANSWER:**     Thornsberry denies the allegations in paragraph 97.

98.     As a direct and proximate result of Defendants' collusion, Tyler has been, and will continue to be, irreparably harmed, and has suffered monetary damages in an amount to be determined at trial.

**ANSWER:**     Thornsberry denies the allegations in paragraph 98.

99.     Pursuant to Ind. Code § 24-1-2-7, Tyler is entitled to treble damages, the costs it incurs in connection with this proceeding, and reasonable attorney's fees.

**ANSWER:**     Thornsberry denies the allegations in paragraph 99.

### COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT
### (against all Defendants)

100.     Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**     Thornsberry incorporates his responses to paragraphs 1-99.

101.     At all relevant times, Tyler had contractual relationships with the Counties.  As discussed above, Tyler entered into cyclical reassessment contracts with the Counties for the time period of 2018–2022, i.e. the 2017 Tyler Contracts.

**ANSWER:**     Thornsberry denies the allegations in paragraph 101.

102.     At all relevant times, Defendants had actual knowledge of the 2017 Tyler Contracts.  During their time as Tyler employees, Davis and Thornsberry were assigned to work with the Counties precisely under those Contracts.  On information and belief, Davis and Thornsberry provided their knowledge of the 2017 Tyler Contracts to Lexur and Fry in connection with the Rebid Conspiracy.  Also, as a regional competitor, Lexur would certainly have known that Tyler was the current service provider for the Counties as to the services for

which it was itself bidding. Moreover, the 2017 Tyler Contracts are publicly available documents.

**ANSWER:**   Thornsberry denies the allegations in paragraph 102.

103.   Defendants knowingly, wrongfully, intentionally, maliciously, and tortiously interfered with Tyler's contractual relationships with the Counties without justification and through improper means by, among other things, encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2017 Tyler Contracts, and to award the cyclical reassessment contracts to Lexur as the sole bidder.

**ANSWER:**   Thornsberry denies the allegations in paragraph 103.

104.   Defendants' interference with the 2017 Tyler Contracts was malicious and specifically directed to the injury and damage of Tyler, as described above.

**ANSWER:**   Thornsberry denies the allegations in paragraph 104.

105.   As a direct and proximate result of Defendants' improper actions, Tyler's contractual relationships with the Counties have been irreparably damaged, and Tyler has suffered monetary damages in an amount to be proven at trial.  Three of the Counties have improperly terminated their cyclical reassessment contracts with Tyler with no proper notice and contrary to the Counties' "best interest," each in breach of the Contracts, and Tyler is in jeopardy of further breaches of contract by other Counties due to Defendants' tortious conduct.

**ANSWER:**   Thornsberry denies the allegations in paragraph 105.

**COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**
**(against all Defendants)**

37

106.   Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**   Thornsberry incorporates his responses to paragraphs 1-105.

107.   At all relevant times, Tyler had business relationships with the Counties.

**ANSWER:**   Thornsberry denies the allegations in paragraph 107.

108.   At all relevant times, Defendants had actual knowledge of the business relationships between the Counties and Tyler.  During their time as Tyler employees, Davis and Thornsberry were assigned to work with the Counties.  On information and belief, Davis and Thornsberry provided their knowledge of Tyler's business relationships with the Counties to Lexur and Fry in connection with the Rebid Conspiracy.  Also, as a regional competitor, Lexur would certainly have known that Tyler was the current service provider for the Counties as to the services for which it was itself bidding. Moreover, the 2017 Tyler Contracts are publicly available documents.

**ANSWER:**   Thornsberry denies the allegations in paragraph 108.

109.   Defendants knowingly, wrongfully, intentionally, maliciously, and tortiously interfered with Tyler's business relationships with the Counties without justification and through improper means by, among other things, encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2018–2022 cyclical reassessment contracts with Tyler, and to award the cyclical reassessment contracts to Lexur as the sole bidder.

**ANSWER:**   Thornsberry denies the allegations in paragraph 109.

110.    Defendants' interference with Tyler's business relationships with the Counties was malicious and specifically directed to the injury and damage of Tyler, as described above.

**ANSWER:**    Thornsberry denies the allegations in paragraph 110.

111.    Defendants' tortious interference with Tyler's business relationships with the Counties involved illegal action including, but not limited to, the violation of federal and Indiana antitrust law.

**ANSWER:**    Thornsberry denies the allegations in paragraph 111.

112.    As a direct and proximate result of Defendants' improper actions, Tyler's business relationships with the Counties have been irreparably damaged, and Tyler has suffered monetary damages in an amount to be proven at trial.  Three of the Counties have terminated their cyclical reassessment contracts with Tyler (without proper notice and despite such terminations not being in the Counties' "best interest"), and Tyler is in jeopardy of losing further contracts due to Defendants' tortious conduct.

**ANSWER:**    Thornsberry denies the allegations in paragraph 112.


### COUNT V: BREACH OF THE DUTY OF LOYALTY
### (against Davis and Thornsberry)

113.    Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**    Thornsberry incorporates his responses to paragraphs 1-112

114.    By employing Davis and Thornsberry, compensating them with salary and benefits, and granting them the power to oversee and manage Tyler's contracts and business relationships, Tyler instilled trust and confidence in Davis and Thornsberry, and relied on them to be honest and to deal with Tyler with the utmost loyalty and good faith.

**ANSWER:**     Thornsberry denies the allegations in paragraph 114.

115.     Tyler further relied upon Davis and Thornsberry to utilize their best skill and judgment during their employment with Tyler, act solely for the benefit of Tyler, and refrain from engaging in any conduct that would aid a competitor of Tyler.

**ANSWER:**     Thornsberry denies the allegations in paragraph 115.

116.     During the course of Davis' and Thornsberry's employment with Tyler, however, Davis and Thornsberry willfully breached their duty of loyalty to Tyler by, among other things, encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2017 Tyler Contracts, to award the cyclical reassessment contracts to Lexur as the sole bidder, and to directly plan for "All Staff" at Tyler working for the Counties to resign and join Lexur, including by directly soliciting those staff members to leave Tyler.

**ANSWER:**     Thornsberry denies the allegations in paragraph 116.

117.     As a direct and proximate result of Davis and Thornsberry's breaches of their duty of loyalty to Tyler, Tyler has been, and will continue to be, irreparably harmed, and has suffered monetary damages in an amount to be determined at trial.  Tyler is entitled to disgorgement of salary and other compensation provided to Davis and Thornsberry, punitive damages, and lost profits.

**ANSWER:**     Thornsberry denies the allegations in paragraph 117.

## COUNT VI: CIVIL CONSPIRACY
### (against all Defendants)

118.    Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**    Thornsberry incorporates his responses to paragraphs 1-117.

119.    Defendants intentionally engaged in concerted action to violate federal and Indiana anti-trust laws and to tortiously interfere with Tyler's contractual and business relationships.  In particular, Defendants encouraged, assisted, and supported a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2018–2022 cyclical reassessment contracts with Tyler, and to award the cyclical reassessment contracts to Lexur as the sole bidder.

**ANSWER:**    Thornsberry denies the allegations in paragraph 119.

120.    As a direct and proximate result of Defendants' unlawful common plan, Tyler has been, and will continue to be, irreparably harmed, and has sustained monetary damages in an amount to be determined at trial.

**ANSWER:**    Thornsberry denies the allegations in paragraph 120.

## COUNT VII: BREACH OF CONTRACT
### (against Thornsberry)

121.    Tyler realleges and incorporates by reference the allegations contained in each of the proceeding paragraphs of this Complaint as if set forth herein.

**ANSWER:**    Thornsberry incorporates his responses to paragraphs 1-120.

122.    On March 4, 2020, Tyler and Thornsberry entered into a valid and binding contract — the Restrictive Covenant Agreement.

**ANSWER:**     Thornsberry denies the allegations in paragraph 122.

123.     Tyler has fully performed its material obligations under the Restrictive Covenant Agreement at all relevant times herein.

**ANSWER:**     Thornsberry denies the allegations in paragraph 123.

124.     Pursuant to the Restrictive Covenant Agreement's terms, Thornsberry agreed to the following (among other things):

> [F]or the one-year period following the termination of [Thornsberry's] employment, for any reason, [Thornsberry] shall not (a) contact, call upon, solicit, or perform services competitive with those of Tyler as to any customer of Tyler for whom [Thornsberry] provided services or solicited, called on, or marketed on behalf of Tyler during the final two years of [Thornsberry's] employment with Tyler, or (b) recruit, solicit or hire, or encourage or assist other persons or entities to recruit, solicit or hire, any employees of Tyler.

Exhibit A at 2.

**ANSWER:**     Thornsberry denies the allegations in paragraph 124.

125.     Thornsberry has expressly communicated to Tyler that he does not believe he has to abide by this restriction.

**ANSWER:**     Thornsberry admits the allegations in paragraph 125.

126.     On information and belief, Thornsberry has breached, or intends to breach, his obligations under the Restrictive Covenant Agreement by performing services for Lexur for the Counties.

**ANSWER:**     Thornsberry denies the allegations in paragraph 126.

127.     As a direct and proximate result of Thornsberry's breach of the Restrictive Covenant Agreement, Tyler has been, and will continue to be, irreparably harmed, and has sustained monetary damages in an amount to be determined at trial.

**ANSWER:**     Thornsberry denies the allegations in paragraph 127.

\*\*\*

## PRAYER FOR RELIEF

**WHEREFORE**, Thornsberry requests that Plaintiff take nothing by way of its Complaint; that judgment be entered in favor of Thornsberry; that Thornsberry be awarded his costs herein, including attorneys' fees; and that all other relief proper in the premises be granted to him.

## JURY DEMAND

Thornsberry demands a trial by jury on all claims so triable.

## AFFIRMATIVE AND OTHER DEFENSES

1.     Plaintiff's Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

2.     Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, waiver, consent, laches, and estoppels.

3.     Plaintiff's claims are frivolous, baseless, and without merit.

4.     Any actions taken by Thornsberry are/were made in good faith and without malice and lack of intentional or reckless disregard to Plaintiff's rights under federal, state, or local laws and ordinances.

5.     Plaintiff is not entitled to recover any damages for which it sues for Plaintiff incurred the risk of any alleged injuries sustained by it.

6.     Plaintiff has failed to mitigate its damages.

7.     Any amount due to Plaintiff is entitled to offset against amount Plaintiff owes to Thornsberry.

Respectfully submitted,

/s/ *Samuel M. Adams*
John H. Haskin, Attorney No. 7576-49
Samuel M. Adams, Attorney No. 28437-49

Attorneys for Defendant Joe Thornsberry

JOHN H. HASKIN & ASSOCIATES
255 North Alabama Street, 2nd Floor
Indianapolis, Indiana  46204
Telephone:      (317)955-9500
Facsimile:      (317)955-2570
Email:          jhaskin@jhaskinlaw.com
                sadams@jhaskinlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was electronically filed this 25th day of September, 2020.  Parties may access this filing through the Court's electronic filing system.  Notice of this filing will be sent to the following counsel of record by operation of the Court's system:

Ann O'Connor McCready – amccready@taftlaw.com

Vivek R. Handley – vhandley@taftlaw.com

Jennifer Nagle – jennifer.nagle@klgates.com

Michael Creta – michael.creta@klgates.com

A. Richard M. Blaiklock – rblaiklock@lewiswagner.com

Aaron D. Grant – agrant@lewiswagner.com

John Carl Trimble – jtrimble@lewiswagner.com

Douglas B. Bates – dbates@stiteslaw.com

Chelsea R. Stanley – cstanley@stiteslaw.com

R. Jeffrey Lowe – jlowe@k-glaw.com

/s/ *Samuel M. Adams*