**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION**

---

| | |
|---|---|
| TYLER TECHNOLOGIES, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| v. | )     C.A. No. 4:20-cv-00173- TWP-DML |
| | ) |
| LEXUR ENTERPRISES INC., ROBERT FRY, | ) |
| JIMMY DAVIS, JOE THORNSBERRY, | ) |
| AND JOHN DOES 1-100 | ) |
| | ) |
|     Defendants. | ) |

---

**PLAINTIFF TYLER TECHNOLOGIES, INC.'S
OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiff Tyler Technologies, Inc. ("Tyler") hereby opposes the Motions to Dismiss filed by Defendants Lexur Enterprises, Inc. ("Lexur") and Robert Fry ("Mr. Fry") (collectively, the "Defendants"). (*See* DE # 29-32) (together, the "Motions to Dismiss" or the "Motions").[1] The Motions do not dispute any of the extensively detailed facts set out in Tyler's 127-paragraph Complaint regarding the deliberate and brazen conspiracy orchestrated by all of the named defendants to rig the bidding process for six Indiana county public works contracts. Nor do the Motions offer any valid challenges to the sufficiency of the Complaint under the applicable pleading standards. Rather, Defendants preview a weak attempt at excusing their conduct, which they flippantly refer to as "opportunism" that somehow enhanced competition, even as the Complaint details their concerted efforts to ensure that no competition would exist at all. Defendants' efforts to justify their misconduct, however, do not undermine the simple fact that the Complaint adequately pleads the claims asserted. The Motions should be denied.

---

[1]     Defendant Jimmy Davis filed a motion to dismiss as well, but Tyler and Mr. Davis have since settled. *See* DE # 56.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Complaint

The gravamen of Tyler's Complaint is that the named defendants[2] engaged in a concerted scheme to interfere with the bidding on Indiana public works contracts.  (DE #1 ¶¶ 1-2).  The goal of the scheme was to restrict the competitive bidding process to Lexur's exclusive benefit and to the detriment of competition itself, Tyler (the contracted-for vendor), and Indiana taxpayers, to whom duties of fairness and transparency are owed in the awarding of public works contracts. (*Id.*).  Tyler summarizes the extensive details set forth in its 127-paragraph Complaint as follows.

Under Indiana Law, Indiana county assessors are required to physically inspect and reassess the value of all real property within their counties over the course of four-year cycles.  (*Id.* ¶ 25).  Indiana county assessors regularly engage private contractors to provide support and assistance in connection with these cyclical reassessments.  (*Id.* ¶ 26).  To engage such contractors, the assessors are required by Indiana law to advertise for bids and select contractors as part of a public, transparent, and competitive process that ultimately results in a contract for the work.  (*Id.*).

As relevant here, in 2017, Tyler bid against other vendors, including Lexur, in such a competitive process for Prescribed Contracts for Cyclical Reassessment for the Indiana counties of Dearborn, Floyd, Jackson, Jefferson, Ripley, and Switzerland (collectively, the "Counties," and the resulting contracts being the "Contracts").  (*Id.* ¶¶ 27-29).  Tyler was awarded those Contracts and has been providing services to the Counties since May 1, 2018.  (*Id.*)  The Contracts, by their terms, run through April 30, 2022.  (*Id.*).

---

[2]     "Defendants," capitalized and as defined above, refers specifically to the moving defendants, Lexur and Mr. Fry.  References to "defendants" generally are to all defendants in the action, including Lexur, Mr. Fry, Jimmy Davis, and Joe Thornsberry, who the Complaint alleges all acted together and in concert.  Since the Complaint was filed, Mr. Davis and Mr. Thornsberry have settled with Tyler.

Defendants Jimmy Davis ("Mr. Davis") and Joe Thornsberry ("Mr. Thornsberry") were long-time Tyler employees (11.5 years each) who, as part of their employment with Tyler, were responsible for Tyler's relationships with, and assessment work for, the Counties.  (*Id.* ¶¶ 2, 33-34).  As Tyler employees, Mr. Davis and Mr. Thornsberry were both entrusted with Tyler's trade secrets, confidential information, and goodwill with Tyler's customers, including the Counties, and were subject to duties of loyalty as well as other confidentiality obligations to Tyler at all relevant times.  (*Id.* ¶¶ 35-39).

Rather than wait to bid competitively against Tyler and other vendors for the next contract cycle in 2022 (as it had in 2017), Lexur had other plans.  Beginning in or about May 2020, on behalf of Lexur, Mr. Fry partnered with Mr. Davis and Mr. Thornsberry, each working from within Tyler, to develop and implement a scheme (the "Rebid Conspiracy") to (i) secretly convince the Counties to rebid mid-cycle; (ii) ensure that neither Tyler nor any other competitor would have knowledge of the anticipated rebids or a full and fair opportunity to bid competitively against Lexur, (iii) ensure that Lexur would be the only bidder and awarded the out-of-cycle contracts no matter what, (iv) arrange for the Counties to terminate Tyler mid-cycle in breach of the Contracts; and (iv) solicit assigned Tyler staff to leave Tyler to join Lexur and work on its newly awarded contracts with Mr. Davis and Mr. Thornsberry.  (*See id.* ¶¶ 40-58).

As detailed in the Complaint, the Rebid Conspiracy involved, among other elements, the following:

- Direct solicitation of the County assessors to commit to rebidding the Contracts, terminating Tyler, and hiring Lexur, even before any rebid issued or any evaluation of bids occurred.  (*Id.* ¶¶ 42, 44).  Defendants successfully manipulated the Counties (except Jackson County) into going along with their plan.  (*Id.* ¶ 44).

- Drafting a calendar outlining the timeline of events for the Rebid Conspiracy (the "Calendar").  (*Id.* ¶¶ 45-49, Exhibit B).  The Calendar specifically referenced the Counties, and provided a day-by-day plan for the Rebid Conspiracy: (1) issuing requests for bids right before and/or

directly over the Fourth of July holiday; (2) closing the bids immediately or just before the next regularly scheduled county commissioners meetings, where Tyler would be terminated and Lexur approved; (3) having "All [Tyler] Activities Halted" and "All [Tyler] Staff Resign"; (4) transitioning the Tyler staff to Lexur; and (5) having Lexur start to provide services for the Counties.  (*Id.*).  As the Calendar demonstrates, defendants had all of these events pre-planned, even though the bid process must, under Indiana law, be competitive, transparent, and fair.

- Drafting the termination notices for the Counties to send to Tyler to terminate the Contracts and coordinating with the Counties to finalize and plan the timing for those terminations, once again well in advance of any bid even being publicized for other potential bidders.  (*Id.* ¶¶ 45, 50, Exhibit B).

- Drafting the actual rebid notices to be issued by the Counties, with a July 6, 2020 bid deadline (the Monday after the July 4th weekend) and coordinating with the Counties regarding such notices.  (*Id.* ¶¶ 55-58).  The correspondence between defendants and the Counties shows, once again, that all steps were in place weeks before the rebids were issued.  (*Id.*).

- Keeping the Rebid Conspiracy a secret, and certainly keeping Tyler entirely in the dark despite Mr. Davis and Mr. Thornsberry knowing everything about it.  (*Id.* ¶¶ 55-60).  None of the Counties notified Tyler that they were issuing requests for bids, and with no reason to be monitoring local papers for out-of-cycle bid notices on the Contracts, Tyler only learned of the requests for bids through happenstance.  (*Id.*).  By the time Tyler learned of the requests for bids, the deadline to submit bids had either already passed, or there was no longer sufficient time to prepare bids.  (*Id.*).  Defendants' plan even involved Mr. Davis outright lying to Tyler when Tyler asked him for any explanation for the Counties' rebids — Mr. Davis denied having any knowledge or explanation, further ensuring that Tyler would have no real chance to bid.  (*Id.* ¶¶ 61-62).

- Ensuring that Lexur would be the sole bidder for each County's rebid and would be awarded each of the new contracts, despite the lack of any competition whatsoever.  (*Id.* ¶¶ 64, 66-67).[3] The anticompetitive, predetermined nature of the Rebid Conspiracy finds ample support in the Complaint.  When Tyler inquired with the Counties regarding why the rebids were even issued (when Tyler belatedly learned of them), for example, the Counties did not even respond.  (*Id.* ¶ 61).  And Mr. Fry signed at least two of the contracts (for Jefferson and Ripley Counties) on July 6, before bidding even closed (and certainly before any contracts to Lexur were approved by those Counties' Boards of Commissioners).  (*Id.* ¶¶ 66-67).

- Mr. Davis' resignation from Tyler on July 6, 2020, to coordinate with the close of bidding and consistent with the plans set forth in the Calendar.  (*Id.* ¶ 65).

- Coordinating the Counties' termination of Tyler's Contracts, providing the draft termination notices and even expressly proposing language requiring Tyler to cease all activities

---

[3]    Tyler's investigation, which continued after the filing of the Complaint and included public records requests to the Counties, confirmed that *Lexur did not even submit bids for some of the Counties, but was awarded the contracts anyway.*

immediately, in direct breach of the Contracts' terms (but consistent with the Calendar).  (*Id.* ¶¶ 47, 68-74, 77, Exhibits B, C-F, M-O).

The Rebid Conspiracy destroyed any semblance of the spirit of competition from the bidding process related to each of the Counties' 2020 rebids.[4]

Beyond eliminating competition from the bid process, defendants' Rebid Conspiracy also directly and tortiously interfered with Tyler's contractual and business relationships with the Counties.  Defendants, of course, knew about the pre-existing Contracts and still acted deliberately to encourage, coordinate, and manipulate the Counties' termination of those Contracts. Importantly, defendants drafted the very notices used by the Counties to terminate Tyler and prepared the specific language in those notices that purported to terminate the Contracts with immediate effect, something that the Contracts did not allow and rendered the Counties in breach. (DE #1, ¶¶ 70-72).  Of course, the Counties' termination of the Contracts was itself a breach of the Contracts' terms, which only allowed for termination in the "best interests" of the Counties (*Id.* ¶ 73).  With the replacement contracts to Lexur procured from a conspiracy to remove competition, and where no other bidders were able to compete, "best interests" were not served.  (*Id.* ¶¶ 73-74).

Defendants worked together towards a common goal — to eliminate competition so that Lexur would be able to secure contracts it otherwise could not secure through normal competitive

---

[4]     Facts developed since the filing of the Complaint underscore the impropriety of the bidding process as a result of the Rebid Conspiracy.  Every single one of the Counties targeted by the Defendants has ultimately reconsidered the path that defendants' led them down.  Dearborn County was at first pulled into defendants' Rebid Conspiracy and issued a rebid but, on reconsideration of the circumstances surrounding its issuance and noting that Lexur was the only entity to submit a bid, decided to issue a second request for bids and, finally, to continue the contract it already had with Tyler.  (DE #1, ¶ 75).  As to the other Counties, Tyler sent them detailed letters alerting them of the facts alleged in the Complaint and protesting the bids, following which each County reversed course.  The Floyd County Board of Commissioners decided against awarding Lexur the contract in the first place and declined to do so.  (DE #1, ¶ 76).  Jefferson, Ripley, and Switzerland Counties uniformly rescinded the Lexur contracts and reinstated Tyler's preexisting Contracts upon learning of the Rebid Conspiracy.

processes (as Lexur's failed 2017 bids demonstrate) and to permanently damage Tyler's contracts and business relationships with the Counties.

## II.     The Motions

Defendants Lexur and Mr. Fry seek dismissal of Tyler's Complaint in its entirety, arguing that (1) Tyler's Sherman Act claim (Count I) fails to allege an antitrust injury; (2) Tyler's Indiana Antitrust claim fails to allege an antitrust injury (Count II); (3) Tyler's tortious interference with contract and tortious interference with business relationships claims (Counts III & IV) fail because the Defendants' self-interest is a sufficient justification to excuse their behavior; (4) Tyler's tortious interference with business relationships claim (Count IV) additionally fails to allege illegal behavior; and (5) Tyler's civil conspiracy claim (Count V) fails because Tyler's other tort claims fail.  (DE #30, p. 4-13; DE #32, p. 2-3).[5]

In response to both Motions to Dismiss, Tyler, with the permission of the Court (DE # 55), submits the instant omnibus Opposition.

## LEGAL STANDARD

A complaint may only be dismissed pursuant to Rule 12(b)(6) if the plaintiff fails to allege facts that "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Seventh Circuit has instructed that "'[p]lausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not."  *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).  To the contrary, all a plaintiff must do is "give enough details about the subject-matter of the case to present a story that holds together."  *Id.*  As Rule 8 provides,

---

[5]       Mr. Fry incorporated Lexur's arguments in their entirety, and made no other arguments.

a plaintiff "need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Erickson v. Pardus,* 551 U.S. 89, 93 (2007)).

Under the notice pleading standard, the court must accept all of the factual allegations in a complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Loja v. Main Street Acquisition*, 906 F.3d 680, 682 (7th Cir. 2018). Further, the Court must limit its inquiry to whether the facts could have happened as opposed to whether they did happen. *See Swanson*, 614 F.3d at 404. The plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Snyder v. Smith*, 7 F. Supp. 3d 842, 855 (S.D. Ind. 2014) (internal quotations omitted) (citing *Sanjuan v. Am. Bd. Of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)). Applying these well-established standards, Defendants' Motions to Dismiss must be denied.

## ARGUMENT

Tyler's 127-paragraph Complaint, accompanied by exhibits documenting defendants' planned steps and schedule for their bid-rigging conspiracy, goes above and beyond the Rule 8 pleading standard and survives any challenge under Rule 12(b)(6). Not only has Tyler provided sufficient details such that its Complaint "holds together," but Defendants are fundamentally on "fair notice" of the claims against them and the grounds for those claims. Defendants clearly have their story about the motivations behind their conduct and the consequences that flowed therefrom, but those are factual disputes that are irrelevant for the purposes of evaluating the plausibility of the Complaint and, as such, do not support dismissal.

## I.    Tyler Has Sufficiently Alleged An Antitrust Injury Under The Sherman Act.

Defendants singularly challenge Tyler's claim pursuant to the Sherman Antitrust Act (15 U.S.C. § 1) (Count I) on the ground that the Complaint does not sufficiently allege an

anticompetitive injury.  (DE #30, p. 4-7).  This challenge fails for two reasons, each of which is addressed in turn.

a.    *The Complaint Is Replete with Allegations of Injury to Competition.*

The entire premise of the Complaint is that defendants colluded to ensure that neither Tyler nor any other competitor would have a full and fair opportunity to bid competitively against Lexur, that Lexur would be the only bidder for the rebid contracts, and that Lexur would be awarded the rebid contracts no matter what.  (DE # 1 ¶¶ 2, 89, 96).   The Complaint expressly states that "Defendants restrained and restricted bidding for public work contracts by reducing the number of potential bidders and rigging the result of the bid process." (*Id.* ¶¶ 89, 96).  These allegations are supported by page after page of detailed facts regarding the collusive manner in which defendants planned and orchestrated an entirely non-transparent, unfair, and anti-competitive bid process.

Defendants' contrived timing for the Counties' issuance of the rebids, for example, takes center stage in the Complaint.  Tyler explains — and defendants' "Calendar" (circulated as early as June 2, 2020) illustrates — that defendants had their plan in the works for weeks (if not months) before the rebids were issued, yet neither Tyler, nor any other competitor, had "notice" of the rebids until the last possible moment, and even then over a federal holiday weekend.  (DE #1, ¶¶ 45-46, 59, Exhibit B).  The Complaint further alleges that Tyler lacked actual notice of the Counties' rebids in sufficient time to submit a bid, due in no small part to the fact that Mr. Davis falsely denied having any knowledge when Tyler asked him what was going on.  (*Id.* ¶¶ 60-62). Indeed, for two of the Counties, Tyler only learned of the rebids after bidding had already closed. (*Id.* ¶ 60).  In other words, defendants' acts of collusion, which Tyler alleges were designed to eliminate competition in connection with the rebids, did just that — Tyler, who would have

otherwise submitted a bid (even at a potentially lower price), was unable to bid at all because defendants had made sure Tyler had no chance to do so.

The Complaint also details the very anti-competitive and intentionally designed outcome of defendants' plan — Lexur was in fact the only "bidder" in response to the Counties' rebids. (DE #1, ¶ 8). Defendant Mr. Fry was so bold as to execute certain of the contracts before bidding was even closed and before the contracts were approved by the Counties. (*Id.* ¶¶ 46, 67). These facts more than plausibly support Tyler's claim that defendants' misconduct harmed competition in a real and alarming way.

Defendants ignore all of Tyler's extensive allegations, though they appear in black and white throughout the Complaint. Instead, Defendants strain credulity by arguing that their efforts actually enhanced competition because Lexur's bid contained a price lower than that set forth in Tyler's pre-existing and in-force Contracts, and because Lexur was a "new competitor." (DE #30, p. 6-7). This is a quintessential red herring.

Of course Lexur's bid was the lowest — it was the only one, by design, and Lexur knew what Tyler's fees were because the existing Contracts were public records. The thrust of the Complaint is that defendants' conduct chilled competition by eliminating the possibility for competitors to compete in the rebid (putting aside the legitimacy of the rebid process itself). Tyler should have had the opportunity to bid against Lexur, but it did not because that was precisely defendants' plan. The same goes for any other third parties that might have been interested in responding to the rebid — any such competition was entirely suppressed by defendants' conduct. Defendants' actions all but guaranteed that the Counties and taxpayers would not receive the lowest price, as Lexur knew the price it had to beat, only had to beat it slightly, and no other vendor had sufficient notice to bid at a lower price. (DE #1, ¶ 74.) Moreover, Lexur was not a "new

competitor."  As set out in the Complaint, Lexur competed with Tyler for the Contracts in 2017. (*Id.* ¶¶ 27-28).

Defendants' elimination of competition from the bid process not only underscores the plausibility of Tyler's Sherman Antitrust claim, but also renders their cited cases inapposite.  The Defendants rely, for example, on *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396 (7th Cir. 2006) for the proposition that there is no antitrust injury when bid rigging results in lower pricing.  (DE #30, p. 5-6). But in that case, there were multiple bids for the project involved, and all of the facts pled in the operative complaint confirmed that the bid rigging at issue drove the price down among various competitors.  453 F.3d at 399-400 (describing multiple bidders and a price-competitive process).  That is drastically different from the allegations of Defendants' Rebid Conspiracy, which confirm that Lexur was the <u>only</u> bidder and knew exactly what price it needed to "beat" (if only marginally) because of the public nature of the existing Contracts.  (DE # 1, ¶¶ 8, 74).  Submitting the "lowest" bid by improperly eliminating all other bidders and exploiting the availability of pricing information from an existing contract does not immunize Defendants from liability.

*Chicago Studio Rental, Inc. v. Illinois Dept. of Commerce* offers Defendants no more help. That decision, like *James Cape & Sons Co.*, stands for nothing more than the proposition that a plaintiff cannot sustain an antitrust claim where the alleged misconduct, on the face of the complaint, actually helped competition by lowering prices and bringing new competitors into the market.  940 F.3d 971, 977-79 (7th Cir. 2019).  Defendants' argumentative statements notwithstanding, the Complaint here contains no such allegations.  To the contrary, and as already noted, Tyler alleges the elimination of competition by an existing market participant.  (DE # 1, ¶¶ 27-28).

Ultimately, the Complaint is replete with allegations regarding not only how Tyler and other potential bidders were harmed by Defendants' conduct, but how competition for multiple Indiana public works contracts was entirely and purposefully eliminated.

        **b.**       ***Bid Rigging Is A Per Se Violation of The Sherman Act.***

Tyler has adequately and plausibly alleged direct injury to competition in its Complaint. Importantly, however, Count I would survive even without such allegations because bid-rigging is considered a *per se* violation of the Sherman Act.  As the Seventh Circuit has explained:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable an inquiry so often wholly fruitless when undertaken.

*U.S. v. Azzarelli Const. Co.*, 612 F.2d 292, 294 (7th Cir. 1979).  Of specific import here, *Azzarelli* involved bid-rigging, which the Seventh Circuit noted "has been recognized as a per se violation since the [Supreme Court's 1899 decision in *Addyston Pipe and Steel Co. v. United States*.]" *Id.* (affirming lower court holding of bid rigging as a *per se* violation); *see also U.S. v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992) (acknowledging certain per se violations of the Sherman Act and holding that "[b]id rigging is one such per se violation") (citing and compiling cases).

Tyler has more than sufficiently alleged injury to competition by virtue of Defendants' direct efforts to <u>eliminate</u> competitors from the bid process, but bid rigging is a *per se* violation in any event.  Defendants' challenges are attempts at a factual debate that will be addressed through the discovery process — but that have no place here.  The Court should deny Defendants' Motions to Dismiss Count I of the Complaint.

**II.     Tyler Has Sufficiently Alleged An Injury Under The Indiana Antitrust Act.**

Defendants make no independent argument for dismissal of Tyler's claim under the Indiana Antitrust Act (Ind. Code § 24-1-2-1, *et seq.*) (Count II).  (DE #30, p. 7-8).  Instead, Defendants state only that the Act is "patterned after the Sherman Antitrust Act" and incorporate the same "lack of anticompetitive injury" argument they make as to the federal claim.  (*Id.*).  Defendants' Motion to Dismiss Count II also fails, for at least two reasons.

First, the Complaint adequately pleads anticompetitive injury, as detailed above.  *See* Section I, *supra*.

Second, Defendants improperly conflate the Indiana Antitrust Act with the federal Sherman Act.  In so doing, they ignore that Indiana Code § 24-1-2-3 includes the following express prohibition that does not appear in the Sherman Act: "[a] person who engages in any scheme, contract, or combination to restrain or restrict bidding for the letting of any contract for private or public work, or restricts free competition for the letting of any contract for private or public work, commits a Class A misdemeanor."  Ind. Code § 24-1-2-3.  Indiana Code § 24-1-2-7(a) goes on to provide a private right of action to "[a]ny person whose business or property is injured."  Ind. Code. § 24-1-2-7.  In other words, Count II of the Complaint arises under language of the Indiana Antitrust Act that does not directly "pattern" after the Sherman Act at all.  Failing to recognize this distinction, Defendants' improperly attempt to sweep Count II under the rug by reference to inapposite federal antitrust cases.

Supposition is not required regarding what injury standard applies to claims under Indiana Code § 24-1-2-3.  Indiana courts have addressed that provision specifically, including by reference to federal law deemed appropriate, and have held that claims under Indiana Code § 24-1-2-3 require (1) a violation of the statute; (2) injury to business or property proximately caused by the

violation; and (3) actual damages.  *See City of Auburn Through Bd. Of Public Works and Safety v. Mavis*, 468 N.E.2d 584, 585 (Ind. Ct. App. 1984); *see also Skyline Roofing & Sheet Metal Co.*, v. *Ziolkowski Const., Inc.*, 26 N.E.3d 1024, 1029 (Ind. Ct. App. 2015) (noting "actual damages" as the damage element to be satisfied).  In *City of Auburn*, the Court assessed a claim under Indiana Code § 24-1-2-3, specifically considered federal authority on the types of injury required, and expressly held that plaintiff's own damages (time and cost wasted on a bid where the process was rigged) were sufficient to sustain the claim.  468 N.E.2d at 585.  Here, Tyler's injuries go much further — significant costs to investigate Defendants' conduct and to inform the Counties of the circumstances, the initial loss of the Contracts for certain of the Counties, and the cost to formally protest the bid process and secure reinstatement of the Contracts, among other injuries detailed in the Complaint.  (DE #1, ¶¶ 69-70, 76).  Under Indiana law, this is sufficient to sustain a claim under Indiana Code § 24-1-2-3.  *See City of Auburn*, 468 N.E.2d at 586.

Defendants' request for dismissal of Count II fails both because Tyler has sufficiently pled an anticompetitive injury and because, under Indiana Code § 24-1-2-3, Tyler's pled damages are sufficient to sustain the claim.

## III.    Tyler Has Sufficiently Alleged A Tortious Interference With Contract Claim.

To state a claim for tortious interference with a contract, a plaintiff must allege the (1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach. *Montgomery v. Lake County, Indiana*, 2005 WL 8170103, at *2 (N.D. Ind. Mar. 11, 2005) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)); *see also Howmedica Osteonics Corp. v. DJO Global Inc.*, 2018 WL 3130969, at *3 (S.D. Ind. Mar. 15, 2018).

Defendants challenge Tyler's pleading only as to prong (4), claiming that they had "justification" for their behavior (to compete for the contracts), and that they are accordingly immune even from discovery into their potential tort liability.  Defendants take three fatal missteps.

First, Defendants ignore black-letter tort law.  To determine the absence of justification element, Indiana courts consider the seven factors outlined in Section 767 of the Restatement (Second) of Torts.  *See Montgomery*, 2005 WL 8170103, at *3; *see also Howmedica Osteonics*, 2018 WL 3130969, at *4.  "[T]he overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances."  *See Howmedica Osteonics*, 2018 WL 3130969, at *4.  Contrary to Defendants' suggestions, tortious interference "does not require malice or conduct exclusively directed to damage of another."  *Montgomery*, 2005 WL 8170103, at *4.  And with respect to competition as a potential justification for a defendant's conduct, Section 768 of the Restatement (Second) of Torts expressly states that competition is only proper justification when "the actor does not employ wrongful means" and "does not create or continue an unlawful restraint on trade."  Restatement (Second) of Torts § 768 (1979); *see also Howmedica Osteonics*, 2018 WL 3130969, at *4; *Buztronics, Inc. v. Theory3, Inc.*, 2005 WL 1865512, at *6 (S.D. Ind. Aug. 5, 2005) (denying defendant's motion to dismiss tortious interference claim).

Here, the Complaint alleges — and the Court must accept as true for purposes of Defendants' Motion — that Defendants employed wrongful means by orchestrating and implementing a scheme to rig the bidding process for various public works contracts, resulting in an unlawful restraint on trade.  Defendants may, through discovery, attempt to demonstrate that they were "only" engaging in "opportunistic" competition in a "fair and reasonable" way.  (DE #30, p. 2).  The facts alleged, however, govern Defendants' Motion and ground a Complaint that at least "holds together" a pattern of wrongful, illegal, and manipulative efforts to eliminate

competition and induce the breach of various Tyler contracts in the process. *See Howmedica Osteonics*, 2018 WL 3130969, at *4. Having alleged that Defendants' conduct was <u>not</u> "fair and reasonable under the circumstances," Tyler has done enough to withstand a motion to dismiss. *See id.*

Second, Defendants are again attempting to infuse their version of events into a pleadings challenge. All that is before the Court is the plausibility of Tyler's Complaint, which alleges in detail that defendants acted with intent to eliminate competition so that they could induce the breach of Tyler's contracts and line their own pockets. Those allegations are sufficient to sustain Tyler's claim against Defendants. Whether defendants acted with a legitimate business purpose that was "fair and reasonable under the circumstances," on the other hand, is a factual inquiry, and not appropriate for resolution at the motion to dismiss stage.

In *Howmedica Osteonics*, the court was clear that factual disputes about the reasons for certain conduct is not appropriate at the pleading stage, holding that "[a]lthough [defendant] may be able to present evidence on summary judgment or at trial that it acted with a business purpose that was 'fair and reasonable under the circumstances', such a factual inquiry is not appropriate for resolution on a motion to dismiss." 2018 WL 3130969, at *5 (quoting *Zimmer, Inc. v. Stryker Corp.*, 2014 WL 3866454, at *8 (N.D. Ind. Aug. 6, 2014)); *see also  U.S Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003) (a plaintiff "need not anticipate or attempt to defuse potential defenses" when drafting a complaint; all it must do is state an "intelligible grievance that, if proved, shows a legal entitlement to relief."); *see also Buztronics,* 2005 WL 1865512, at *6 (plaintiff adequately pled absence of justification despite defendant's argument that it acted with justification, because such an assertion is an argument on the merits of the claim).

Tyler has met its pleading standard and Defendants' attempts at justifying their conduct will be addressed through discovery and adjudication on the merits.

Third, Defendants ignore those portions of the Complaint that allege that they induced the Counties to breach the Contracts in ways entirely unrelated to Lexur's interest in "competing" for the Counties' business.  Specifically, the Complaint details that Defendants not only orchestrated the Rebid Conspiracy, but coordinated the Counties' termination of Tyler, including by drafting the termination notices and specifically suggesting language that called for Tyler to cease work immediately, in direct violation of the Contracts' 30-day termination notice provisions.  (DE #1, ¶¶ 50, 68-73).  Even if Defendants' self-interest in securing the Counties' contracts can be used as a shield against tortious interference claims (it cannot), or is a matter that can properly be addressed at this stage (it is not), it would still not provide any support for dismissal of Count III because Defendants' interest in "competing" for the Counties' contracts would not in any way explain why they participated in the process of terminating Tyler and deliberately sought to have Tyler terminated immediately.

Defendants ignore Tyler's well-pled facts and well-established authority in favor of citations to two cases that do not support their position.  As an initial matter, neither case cited by Defendants — *Konecranes, Inc. v. Davis*, 2013 WL 1566326 (S.D. Ind. 2013) and *Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 877 (Ind. Ct. App. 1988) — is an Indiana Supreme Court decision.  As stated in *Howmedica Osteonics*:

> When adjudicating matters of Indiana state law, however, we are bound to apply the law espoused by the Indiana Supreme Court. Our analysis thus reflects that court's adoption of the Restatement (Second) of Torts §§ 767 and 768 as the means to adjudicate claims for tortious interference and that court's directive that 'the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances.'

2018 WL 3130969, at *5 (citing *Winkler*, 638 N.E.2d at 1235).  The Indiana Supreme Court has adopted Sections 767 and 768 of the Restatement and, as such, the applicable standard is whether the conduct alleged was "fair and reasonable."  *Id.*  Accepting the well-pled allegations of the Complaint as true, Defendants' conduct was quintessentially unfair and unreasonable.

Even if *Konecranes* or *Harvest Life* were binding precedent, they merely stand for the unremarkable proposition that fair and ordinary competition cannot itself establish tortious interference.  They deal with situations where the conduct at issue was, as the *Konecranes* court put it, "in the spirit of business competition."  2013 WL 1566326 at *3.  Tyler's Complaint alleges the complete opposite.  Defendants were free to compete with Tyler in the ordinary course, as they did in 2017.  They were free to engage in the "spirit of business competition."   That is not what Defendants did.  As the Complaint details, the Defendants worked to manipulate the bidding process, eliminate competition and competitors (not just Tyler, but all competitors), and ensure that Lexur's bid and price would win no matter what, even if lower and/or better bids might have been forthcoming in a normal, competitive process.  Defendants' conduct flies in the face of the "spirit of business competition."

IV.     **Tyler Has Sufficiently Alleged A Tortious Interference With Business Relationships Claim Against The Defendants.**

The elements of a claim for tortious interference with business relationships are nearly identical to the elements of a claim for tortious interference with contract.  *See Howmedica Osteonics*, 2018 WL 3130969, at *3 (citing *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000)).  The main differences between the two claims are that, for a business relationships claim, the plaintiff does not have to prove the existence of a contract, but must prove "independent illegal action" by the defendant.  *See id.*; *see also Buztronics*, 2005 WL 1865512, at *5 (plaintiffs need to show that "the defendant acted illegally in achieving its goal.").  Defendants seek dismissal of

Tyler's tortious interference with business relationships claim on the grounds that (i) like Tyler's tortious interference with contract claim, it requires pleading an absence of justification and Tyler has not done so; and (ii) Tyler has not adequately alleged illegal activity by Defendants.  Neither argument succeeds.

For all of the reasons already explained above, the Complaint adequately and comprehensively outlines that Defendants' conduct was not ordinary competitive behavior and there is no justification for it.  *See supra*.

The Complaint also more than adequately alleges illegal activity by virtue of its claims for violation of both the federal and Indiana antitrust laws.  The Seventh Circuit has held that non-criminal illegal acts are sufficient to prove the illegality element of this type of tort claim.  *See Syndicate Sales, Inc. v Hampshire Paper Co.*, 192 F.3d 633, 641 (7th Cir. 1999) ("[C]ourts interpreting Indiana law have held that non-criminal illegal acts are sufficient."); *see also Buztronics*, 2005 WL 1865512, at *6.  Moreover, Indiana Code § 24-1-2-3, under which Count II is brought, renders the type of bid rigging activity alleged against Defendants "a Class A misdemeanor."  Ind. Code § 24-1-2-3.  The "illegal activity" prong has been pled by Tyler.

Tyler has sufficiently pled all elements of a tortious interference with business relationships claim, including that the Defendants acted illegally by violating federal and Indiana antitrust law.  Defendants' Motions to Dismiss Count IV should be denied.

**V.    Civil Conspiracy Is Acknowledged Under These Circumstances.**

While Indiana does not recognize an independent, stand-alone cause of action for conspiracy, it does recognize such a cause of action when alleged alongside underlying tort claims. *See Hall v. Shaw*, 147 N.E.3d 394, 408 (Ind. Ct. App. 2020); *see also Birge v. Town of Linden*, 57 N.E. 3d 839, 846 (Ind. Ct. App. 2016).  Tyler has pled its civil conspiracy claim in conjunction

with its tortious interference with contract (Count III) and tortious interference with business relationships (Count IV) claims.  *See Birge*, 57 N.E.3d at 846 ("an allegation of civil conspiracy is 'just another way of asserting a concerted action in the commission of a tort.'").  Just as Tyler's tort claims survive these Motions, so too does its civil conspiracy claim.  *See id.* (finding the plaintiffs had sufficiently pled their claim for civil conspiracy by alleging that the defendants conspired to create a nuisance that caused them damage).  Defendants' Motions to Dismiss Count V should be denied.

### **<u>CONCLUSION</u>**

For the foregoing reasons, Tyler respectfully requests that this Court deny the Defendants' Motions to Dismiss and provide Tyler such other relief as it deems just and equitable.

*[Signature page follows]*

Respectfully submitted,

*/s/  Ann O'Connor McCready* _____
Ann O'Connor McCready (Ind. Atty. No. 32836-53)
amccready@taftlaw.com
Vivek R. Hadley (Ind. Atty. No. 32620-53)
vhadley@taftlaw.com
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699

Jennifer J. Nagle (Mass. Bar No. 669325)
(*pro hac vice* to be filed)
jennifer.nagle@klgates.com
Michael R. Creta (Mass. Bar No. 693340)
(*pro hac vice* to be filed)
michael.creta@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3100
Fax: (617) 261-3175

*Counsel for Tyler Technologies, Inc.*

Dated: January 18, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2021, a copy of the foregoing document titled *Plaintiff*

*Tyler Technologies, Inc.'s Omnibus Opposition To Defendants' Motions To Dismiss* was filed

via CM/ECF and served on all counsel of record.


*/s/ Ann O'Connor McCready*
Ann O'Connor McCready (Ind. Atty. No. 32836-53)