# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | | |
|---|---|---|
| TYLER TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00173-TWP-DML |
| | ) | |
| LEXUR ENTERPRISES INC., ROBERT FRY, | ) | |
| and JOHN DOES 1-100, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on separate Motions to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants Lexur Enterprises Inc. ("Lexur") (Filing No. 29), and Robert Fry ("Fry") (Filing No. 31), (collectively, "Defendants"). This case was initiated by Plaintiff Tyler Technologies, Inc. ("Tyler") against Defendants "for (1) violation of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, (2) violation of the Indiana Antitrust Act, Ind. Code § 24-1-2-1, *et seq.*, (3) tortious interference with contract, (4) tortious interference with business relationships, and (5) civil conspiracy." (Filing No. 1 at 1).[1] Defendants have separately moved to dismiss, arguing that all claims against them, as alleged, fail (Filing No. 29; Filing No. 31).[2] For the following reasons, the Defendants Motions are **granted**.

---

[1] Tyler also brought claims against Jimmy Davis ("Davis") and Joe Thornsberry ("Thornsberry"), who "both were active Tyler employees" until July 2020. (Filing No. 1 at 1–3, 6, 26–33.) These claims, however, have since been dismissed with prejudice by stipulation (*see* Filing No. 63 (dismissing claims against Thornsberry); Filing No. 67 (dismissing claims against Davis)).

[2] Though Lexur and Fry moved to dismiss the claims against them independently, because Fry adopted Lexur's lead and reply arguments in their entirety (*see* Filing No. 32; Filing No. 65), the Court will refer to the arguments made in Lexur's briefing as "Defendants'". For its part, Tyler responded with an "omnibus Opposition" brief (*see* Filing No. 58).

# I. BACKGROUND

The following facts are not necessarily objectively true, but, as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Complaint and draws all inferences in favor of Tyler as the non-moving party. *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). Though the Complaint goes into much greater detail, the following factual background suffices to provide adequate context for purposes of this Entry.

Pursuant to Indiana law, county assessors must physically inspect and reassess the value of all real property over the course of four years (Filing No. 1 at 8). To achieve this task, assessors regularly contract with private enterprises to provide necessary support and advice with these so-called "cyclical reassessments." *Id.* As part of this process, assessors must advertise for bids, which usually occurs in the year before the start of a new cycle. *Id.* Consistent with this practice, Tyler— "the largest software company in the nation that focuses solely on providing integrated software and technology services to the public sector"—bid in 2017 for contracts with Dearborn, Floyd, Jackson, Jefferson, Ripley, and Switzerland Counties (the "Counties") to provide reassessment support starting in 2018. *Id.* at 5, 6, 8. Lexur—"a regional competitor" with work "limited almost exclusively to Ohio"—was one of Tyler's rivals for the contracts. *Id.* at 6, 8–9. Ultimately, Tyler won the contracts with their terms running from May 1, 2018, through April 30, 2022. *Id.* at 8–9.

Davis and Thornsberry were both long-time Tyler employees who, in their respective roles, served as liaisons between the company and the Counties. *Id.* at 9–10. Starting in May 2020, however, Davis and Thornsberry worked in conjunction with Lexur and Fry (Lexur's President and Chief Financial Officer) to covertly create a scheme to (1) convince the Counties to reopen a bidding process "mid-cycle" (that is, before the four-year cycle concluded in 2022), (2) leave other competitors (including Tyler) in the dark about the process (rendering them unable to meaningfully submit bids), (3) guarantee that Lexur was awarded the contracts (by submitting bids that were

lower than Tyler's previous successful proposals), (4) coordinate the termination of Tyler's contracts with the Counties, and (5) solicit other Tyler employees to work for Lexur on the newly-awarded contracts. *Id.* at 6, 12–18.[3]

Specifically, the Complaint alleges that Defendants directly solicited the assessors to pledge to rebidding the contracts, terminating Tyler, and hiring Lexur ([Filing No. 1 at 12](#)). In fact, Defendants drafted a calendar that outlined the plan, providing a day-by-day contour of the scheme. *Id.* at 13–14. As shown by this agenda, the rebidding process was to be advertised the week preceding the Fourth of July holiday weekend in 2020. *Id.* The Counties were then to close the bidding windows either immediately or just before the next scheduled county commissioner meetings where Lexur (the only bidder) would be approved to replace Tyler. *Id.* Finally, the Counties would immediately halt all activities of Tyler with certain staff resigning from Tyler and transitioning to Lexur. *Id.*

Defendants themselves drafted the termination notices the Counties were to send to Tyler and organized the timing of the terminations, while, of course, knowing about the pre-existing contracts. *Id.* at 13, 20–22. Defendants also prepared the rebid notices, working with the Counties to make sure that the planned timeline came to fruition. *Id.* at 16–18. Despite Davis and Thornsberry working for the company at the time, Tyler, and no other competitors, were privy to this out-of-cycle rebid process with Davis even directly denying having knowledge of the Counties (for which he was responsible) planning to rebid. *Id.* at 18. None of the Counties directly told Tyler about the rebidding, and Tyler only learned about the request for bids by coincidence, leaving

---

[3] The Complaint also alleges that various "other individuals or entities encouraged, assisted, or supported Defendants in their anti-competitive scheme to restrict bidding on public works contracts and to tortiously interfere with Tyler's contractual and business relationships." ([Filing No. 1 at 7](#).) The Complaint, however, fails to outline the involvement of these John Doe Defendants in any meaningful way. Defendants suggest that these John Does "are not parties unknown to Tyler"; instead, "they are the counties themselves and certain unnamed county employees." ([Filing No. 30 at 2](#) n.1.) Defendants opine that Tyler does not want to, however, "put itself in the awkward position of naming its own customers as Defendants." *Id.* The Court will not speculate as to these unnamed defendants' identities.

Tyler with neither sufficient time nor context to submit a bid. *Id.* In fact, by the time Tyler learned about the rebidding, the windows had already closed in two Counties. *Id.* In the end, with the plan followed dutifully, Lexur was the sole bidder in the rebid process. *Id.* at 19.[4] And on schedule, Davis resigned from Tyler on July 6, 2020. *Id.* Ultimately, on August 10, 2020, and under various theories, Tyler sued Defendants, who, for their part, move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. Courts, however, "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual

---

[4] Tyler asserts in its response brief that "[e]very single one of the Counties targeted by the Defendants has ultimately reconsidered the path," either reopening the bidding process or declining or rescinding a contract with Lexur (Filing No. 58 at 5). The Court, however, will not consider these facts when ruling on this Motion to Dismiss. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (noting that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" and that "consideration of a motion to dismiss is limited to the pleadings") (citations omitted).

support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.    DISCUSSION

Tyler brings five claims against Defendants: (1) Sherman Antitrust Act violations, (2) Indiana Antitrust Act violations, (3) tortious interference with a contract, (4) tortious interference with a business relationship, and (5) civil conspiracy. As Defendants largely attack each claim successively, the Court will discuss the Counts in turn.

### A.    Sherman Act violations

In Count I, Tyler brings a claim for violation of the Sherman Antitrust Act (the "Sherman Act"), alleging that "Defendants restrained competition for public works contracts by reducing the number of potential bidders and rigging the result of the bidding process." (Filing No. 1 at 26.) Defendants maintain that Tyler has failed to "allege an anti-trust injury necessary to state a claim under Section 1 of the Sherman Act." (Filing No. 30 at 4.) To demonstrate an antitrust injury, a plaintiff must show "that its injury is 'of the type the antitrust laws were intended to prevent.'" *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). It does not suffice "to allege that the injury is merely causally linked to the alleged anticompetitive behavior"; instead, a plaintiff "must also demonstrate that its injury 'is attributable to an anti-competitive

aspect of the practice under scrutiny.'" *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

Defendants argue that "[a]ccording to Tyler's own allegations, Lexur's alleged actions resulted in the six counties at issue receiving bids from Lexur that were *lower* than Tyler's bids." ([Filing No. 30 at 6](#) (emphasis in original).)  Because "no antitrust injury exists" when "an alleged conspiracy results in lower prices to consumers," the claim should be dismissed.  *Id.* (citing *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006)).  Defendants additionally note that Tyler also alleges that "Lexur's activities resulted in a new entrant to the Indiana real estate assessment market," which, in fact, "suggests a pro-competitive result." *Id.* (citing *Chicago Studio Rental, Inc. v. Illinois Dept. of Commerce*, 940 F.3d 971, 978 (7th Cir. 2019)).  In sum, "Tyler has only pleaded injuries to itself rather than an anticompetitive injury to the market," and "any alleged conspiracy by the Defendants resulted in the entry of a new competitor into the Indiana market and lower bids being made for cyclical reassessment contracts." *Id.* at 7.

Tyler responds that it has "sufficiently alleged an antitrust injury under the Sherman Act." ([Filing No. 58 at 7](#).) Tyler maintains that its Complaint is "replete" with allegations of injury to competition, demonstrating that Defendants "colluded to ensure that neither Tyler nor any other competitor would have a full and fair opportunity to bid competitively against Lexur, that Lexur would be the only bidder for the rebid contracts, and that Lexur would be awarded the rebid contracts no matter what." *Id.* at 8. Indeed, "page after page of detailed facts" supports its allegations. *Id.* For example, Tyler argues that "Defendants' contrived timing for the Counties' issuance of the rebids . . . takes center stage in the Complaint." *Id.* Because of this timing, "Lexur was in fact the only 'bidder' in response to the Counties' rebids." *Id.* at 9. These facts, as argued by Tyler, "more than plausibly support" the Sherman Act claims when the conduct "harmed

competition in a real and alarming way." *Id.* And though Lexur's solitary bids were, of course, "the lowest," this was "by design" and "chilled competition by eliminating the possibility for competitors to compete." *Id.* In sum, Defendants' conduct "all but guaranteed that the Counties and taxpayers would not receive the lowest price" when all competitors were "entirely suppressed" from submitting rival bids. *Id.* As for the contention that Lexur's conduct increased competition by introducing itself as a "new competitor" in the market, Lexur had previously "competed with Tyler for the Contracts in 2017." *Id.* at 9–10. In any event, Tyler contends that the claim also survives "because bid-rigging is considered a *per se* violation of the Sherman Act." *Id.* at 11. Pointing to *U.S. v. Azzarelli Construction Company*, Tyler maintains that it has alleged this type of practice, which, because of its "'pernicious effect on competition and lack of any redeeming virtue,'" is "'conclusively presumed to be unreasonable and therefore illegal.'" *Id.* at 11 (quoting 612 F.2d 292, 294 (7th Cir. 1979)).

Defendants reply that Tyler tries to "create new antitrust law" when it argues that "Lexur's alleged actions harmed the bidding process and resulted in bids that may have been higher than hypothetical bids that could have been made absent the alleged procedural malfeasance." ([Filing No. 64 at 2](#) (emphases removed).) Defendants contend that Tyler "does not provide any factual allegations that support a finding that consumers—rather than Tyler itself—were harmed by Lexur's alleged conduct." *Id.* at 3 (emphasis removed). Though Tyler may have been harmed by Lexur's alleged conduct, "antitrust law is not intended to protect Tyler's interests in maintaining its uncompetitive prices with the Counties; antitrust law actually discourages such claims." *Id.* (citing *United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003); *Chicago Studio*, 940 F.3d at 978). In short, Tyler "cannot escape" that it has pled that "Lexur's bids were lower than the bids received by the Counties in previous bidding cycles." *Id.* at 4. Regarding

"Tyler's post-hoc effort to claim it has pled bid rigging," Defendants maintain that this practice requires "an agreement among competitors to fix prices submitted to a buyer or to divvy up work among themselves." *Id.* at 4–5 (citing *U.S. v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 336 (3rd Cir. 2010); 1 Callmann on Unfair Comp., Tr. & Mono. § 4.34 (4th ed.)) (emphasis removed). Because Tyler does not allege "that Lexur colluded with other competitors to allow Lexur to obtain the bids from the Counties," Defendants argue that "there is no *per se* wrongful conduct." *Id.* at 6. Defendant contend that Tyler's reliance on *Azzarelli* is misplaced because the alleged conduct in that case "involved an agreement among competitors to allocate bidding for projects among themselves." 612 F.2d at 297.

The Court agrees with Defendants: Tyler has not pled sufficient facts to demonstrate that consumers were harmed by Lexur's alleged conduct, the type of injury that falls behind the Sherman Act's shield. To show antitrust injury, a plaintiff must prove that its loss flows from an anticompetitive *effect* of the defendant's behavior since it betrays the Sherman Act's purpose to award damages for losses stemming from acts that do not hurt competition. *Atlantic Richfield*, 495 U.S. at 334. In other words, when an injury flows from aspects of a defendant's conduct that are beneficial or neutral to competition—even if the defendant's conduct is illegal *per se*—there is no antitrust injury. *See id.* By way of example, if a defendant acquired market power through a series of illegal mergers, and then *lowered* prices to enhance its market share, a competitor who lost profits would not be able to establish antitrust injury. *See generally Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.") (quotation omitted). Here, there is no doubt that prices went down; Tyler admits

as much in its Complaint (and briefing). Because Tyler's alleged injury does not flow from conduct that was harmful to competition, it has not pled an injury as contemplated by the Sherman Act.

As for bid rigging, that practice is "a form of price fixing in which *bidders agree* to eliminate competition among them, as by taking turns being the low bidder." *United States v. Fenzl*, 670 F.3d 778, 780 (7th Cir. 2012) (citations omitted) (emphasis added).[5]  Clearly, this type of *per se* violation of the Sherman Act requires some agreement among competitors to manipulate a market. Tyler has alleged no such thing, and instead simply proclaims in its Complaint that "*Defendants* restrained competition for public works contracts by reducing the number of potential bidders and rigging the result of the bidding process." ([Filing No. 1 at 26](), 27–28 (emphasis added).)  Notably absent from this allegation is *any* remark of a competitor conspiring with Defendants let alone any discussion of the collusive conduct in which they purportedly engaged. *See Fenzl*, 670 F.3d at 780.  There is no mention in the Complaint of a competitor of Lexur aside from Tyler, which, of course, claims to be the victim of—not a participant in—the supposed bid rigging.  And, in fact, Tyler admits that no other competitor joined with Lexur in the supposed scheme, writing in its response brief that Defendants "colluded to ensure that neither Tyler *nor any other competitor* would have a full and fair opportunity to bid competitively against Lexur." ([Filing No. 58 at 8]() (emphasis added).)  Because Tyler has failed to allege that Lexur "agreed" with any other competitor to rig bids, it has not pled this *per se* violation of the Sherman Act.

Because Tyler has not sufficiently pled an antitrust injury under the Sherman Act, the Court **grants** Defendants' Motions as they pertain to Count I.

---

[5] *See also* "Bid Rigging," AN FTC GUIDE TO ANTITRUST LAWS, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/bid-rigging (last visited May 27, 2021) ("Bid rigging can take many forms, but one frequent form is when competitors agree in advance which firm will win the bid. For instance, competitors may agree to take turns being the low bidder, or sit out of a bidding round, or provide unacceptable bids to cover up a bid-rigging scheme. Other bid-rigging agreements involve subcontracting part of the main contract to the losing bidders, or forming a joint venture to submit a single bid.").

**B.**    <u>**Indiana Antitrust Act violations**</u>

In Count II, Tyler brings a claim for a violation of Indiana Code § 24-1-2-3, the Indiana Antitrust Act ([Filing No. 1 at 27](#)). Specifically, Tyler alleges the Defendants violated this Act by "encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, to terminate the Counties' 2017 Tyler Contracts, and to award the cyclical reassessment contracts to Lexur as the sole bidder." *Id.* Defendants argue that because the "Indiana Antitrust Act is patterned after the Sherman Antitrust Act"—and the same "standards are applied"—this claim should be dismissed for the same reason as above: there is no "'antitrust injury or competitive harm.'" ([Filing No. 30 at 7](#)–8 (quoting *Diech-Kiebler v. Bank One*, No. 404-cv-00005, 2005 WL 2428210 at *6 (S.D. Ind. Sept. 30, 2005)).)

Tyler responds that not only does the claim survive for the reasons described in the prior subsection but also because "Defendants improperly conflate the Indiana Antitrust Act with the federal Sherman Act." ([Filing No. 58 at 12](#).) Notably, the Indiana Antitrust Act, unlike the Sherman Act, specifically provides that "'[a] person who engages in any scheme, contract, or combination to restrain or restrict bidding for the letting of any contract for private or public work, or restricts free competition for the letting of any contract for private or public work, commits a Class A misdemeanor.'" *Id.* (quoting Ind. Code § 24-1-2-3). As the Indiana Antitrust Act provides a private right of action to enforce this provision, *see* Ind. Code § 24-1-2-7(a), Tyler maintains that plaintiffs have an additional means of relief not available under the Sherman Act ([Filing No. 58 at 12](#)). As for cognizable injury under Indiana Code § 24-1-2-3, the Indiana Court of Appeals has "expressly held that plaintiff's own damages (time and cost wasted on a bid where the process was rigged) were sufficient to sustain [a] claim." *Id.* at 13 (quoting *City of Auburn Through Bd. Of Public Works and Safety v. Mavis*, 468 N.E.2d 584, 585 (Ind. Ct. App. 1984)). "Here," Tyler

concludes, harm exceeds this metric when injuries include "significant costs to investigate Defendants' conduct and to inform the Counties of the circumstances, the initial loss of the Contracts for certain of the Counties, and the cost to formally protest the bid process and secure reinstatement of the Contracts, among other injuries detailed in the Complaint." *Id.*

Defendants reply that the Indiana Antitrust Act requires the same type of "antitrust injury" as federal antitrust law and that "the specific Indiana statute cited by Tyler requires a showing of collusion between multiple parties." (Filing No. 64 at 7.) First, a plaintiff must generally allege under the Indiana Antitrust Act an "'antitrust injury' that 'naturally flows from what makes the defendant's acts unlawful.'" *Id.* at 7–8 (quoting *City of Auburn*, 468 N.E.2d at 585). In any event, the damages alleged in *City of Auburn*—the case on which Tyler relies—were "incurred in preparing a bid that was never going to be successful," whereas here, "Tyler seeks to recover for damages it incurred only *after* it lost the contracts." *Id.* at 8 (emphasis in original). Because "Tyler would have incurred the same costs if it lost the contracts with the Counties regardless of the legality or illegality of the Defendants' conduct," its alleged damages "are not 'the type of injury which naturally flows from what makes the defendant's acts unlawful.'" *Id.* at 8–9 (quoting *City of Auburn*, 468 N.E.2d at 586). By way of comparison, Defendants point to *Thompson v. Vigo County Board of County Commissioners*, where the Indiana Court of Appeals held that there was no antitrust injury when a plaintiff, like Tyler, "'did not even expend the effort to prepare a bid.'" *Id.* at 9 (quoting 876 N.E.2d 1150, 1156 (Ind. Ct. App. 2007)). Defendants note that the *Thompson* panel reasoned that "'it would be difficult to prove, let alone speculate, that [plaintiff] would have been the successful bidder but for the purported collusion.'" *Id.* (quoting 876 N.E.2d at 1155).

As for Indiana Code § 24-1-2-3, Defendants note that this provision of the Indiana Antitrust Act requires a plaintiff to "show that two or more parties colluded together to engage in a 'scheme,

contract, or combination' to restrict bidding." *Id.* at 10 (quoting *Shook Heavy and Environmental Const. Group, a Div. of Shook, Inc. v. City of Kokomo*, 632 N.E.2d 355, 359 (Ind. 1994)). And "[m]ultiple individuals representing the same entity cannot 'collude' together for the purposes of satisfying the statutory 'collusion or fraud' requirement." *Id.* at 11 (citing *Fuller v. Town of Vevay ex rel. Vevay Town Council*, 713 N.E.2d 318, 322 (Ind. Ct. App. 1999)). Here, Tyler has not alleged "that Lexur coordinated with any other competitors or entities to enact this 'conspiracy.'" *Id.*

The Court agrees with Defendants: Tyler has not alleged sufficient injury under the Indiana Antitrust Act to state a claim. When plaintiffs proceed through the private right of action contained in the Indiana Antitrust Act, they must show an –

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause.

*Alva Elec., Inc. v. Evansville-Vanderburgh Sch. Corp.*, 7 N.E.3d 263, 269 (Ind. 2014) (quoting *Brunswick*, 429 U.S. at 489). In fact, "Indiana precedent reflects that when an antitrust action is brought privately actual injury to the plaintiff must be demonstrated." *Id.* at 270. As held in *Thompson*, a plaintiff who "did not even expend the effort to prepare a bid" does not suffer an injury that "'naturally flow[s]' from the collusion," even assuming such collusion occurred. 876 N.E.2d at 1156. It would, of course, as Defendants noted, "be difficult to prove, let alone, speculate, that [a plaintiff] would have been the successful bidder but for the purported collusion" in this instance. *Id.* at 1155. Here, Tyler's alleged injury—that it *potentially* would have won the bids *if* it had enjoyed the chance to prepare one—is too speculative to meet this essential element under the Indiana Antitrust Act. *See Alva Elec.*, 7 N.E.3d at 270 (citing *Thompson*, 876 N.E.2d at 1156) (holding that "without evidence of injury, [plaintiffs] are not entitled to relief").

Regarding Indiana Code § 24-1-2-3, this provision requires collusion between distinct entities. *See Gariup Const. Co. v. Carras-Szany-Kuhn & Assocs., P.C.*, 945 N.E.2d 227, 240 (Ind. Ct. App. 2011) (affirming summary judgment of Indiana Code § 24-1-2-3 claim when "none of the facts of this case, taken alone or as a whole, raises a genuine issue of material fact from which a factfinder *could reasonably infer collusion*") (emphasis added); *Skyline Roofing & Sheet Metal Co. v. Ziolkowski Const., Inc.*, 957 N.E.2d 176, 187–88 (Ind. Ct. App. 2011) (responding to argument that "'[t]here must be some combination or collusive activity between two or more distinct entities before there can be a violation of antitrust laws'" by noting that plaintiff "alleged collusion between three entirely distinct entities"). Here, as described in the subsection above, Tyler has not alleged that Defendants colluded with any others and instead merely alleges that they "colluded" among themselves (*see* Filing No. 1 at 28 (noting in the Complaint that Tyler has been harmed "[a]s a direct and proximate result of Defendants' collusion"). This does not suffice to state a claim under Indiana Code § 24-1-2-3. *See Fuller*, 713 N.E.2d at 322 ("It is clear then that the [defendant] cannot scheme, contract or combine with itself in violation of Indiana Code Section 24-1-2-3."); *Tilbury v. City of Fort Wayne*, 471 N.E.2d 1183, 1186 (Ind. Ct. App. 1984) (same).

Because Tyler has not sufficiently pled a violation of the Indiana Antitrust Act, the Court **grants** Defendants' Motions as they pertain to Count II.

## C.   Tortious interference with a contract

In Count III, Tyler brings a claim for tortious interference with a contract (Filing No. 1 at 28–29). To state a claim for tortious interference with a contract, a plaintiff must allege (1) the existence of a valid and enforceable contract, (2) the defendant's knowledge of the existence of the contract, (3) the defendant's intentional inducement of the breach of contract, (4) an absence of justification for the defendant's conduct, and (5) damage resulting from the defendant's wrongful inducement of the breach. *Nat'l City Bank, Indiana v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind.

1997), s*upplemented on other grounds sub nom. Nat'l City Bank, Ind. v. Shortridge*, 691 N.E.2d 1210 (Ind. 1998) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994); *Daly v. Nau*, 167 Ind. App. 541, 549 n.6, 339 N.E.2d 71, 76 n.6 (1975)).

The fourth prong of this test is at issue here: "absence of justification."  Deceptively plain, Indiana appellate courts have struggled to delineate a canonical definition of this phrase.  On one hand (and as advanced by Defendants (*see* [Filing No. 30 at 8](#)–9)), some panels of the Indiana Court of Appeals have held that this prong is established only if "the breach is malicious and exclusively directed to the injury and damage of another." *Miller v. Cent. Indiana Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (quotation omitted), *trans. denied*; *see also Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 488 (Ind. Ct. App. 2017); *Duty v. Boys & Girls Club of Porter Cty.*, 23 N.E.3d 768, 775 (Ind. Ct. App. 2014). The Indiana Supreme Court, however, "summarily affirm[ed]" the language of one panel that recognized that the higher court, as noted by Tyler (*see* [Filing No. 58 at 14](#)), did not "discuss or even suggest that a malicious standard . . . was the appropriate standard with which to analyze the absence of justification." *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 560 (Ind. 2006); *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 51 (Ind. Ct. App. 2004), *rev'd on other grounds*; *see also* Ind. App. R. 58(A)(2) (instructing that portions of Court of Appeals' opinions that are "summarily affirmed . . . shall be considered as Court of Appeals' authority").  In fact, the last time the Supreme Court directly considered how to determine whether conduct was justified in this context, it weighed

(a)     the nature of the defendant's conduct;

(b)     the defendant's motive;

(c)     the interests of the plaintiff with which the defendant's conduct interferes;

(d)     the interests sought to be advanced by the defendant;

(e)      the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f)      the proximity or remoteness of the defendant's conduct to the interference; and

(g)      the relations between the parties.

*Winkler*, 638 N.E.2d at 1235 (citing *Restatement (Second) of Torts* § 767 (1977)). Conspicuously absent from *Winkler* is any mention of malice;[6] instead, the Court noted that "the overriding question is whether the defendants' conduct has been fair and reasonable under the circumstances." *Id.* (citing *Restatement (Second) of Torts* § 767 cmt. j).

With a split in Court of Appeals precedent, this Court proceeds under the test endorsed by Indiana's court of last resort in *Winkler*. *See Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002) (Indiana law does not require "that the interference be 'malicious'; it's enough if it's intentional and unjustified. The word 'malicious' does appear in a few cases, but it is apparent that the 'malice' to which it refers . . . is intentionality rather than ill will.") (citations omitted). Even under this framework, however, Defendants contend that the Complaint merely alleges that Lexur's conduct furthered its "intent to enter the Indiana real estate assessment market and compete with Tyler." (Filing No. 30 at 9.) Because "courts have held that competition is a legitimate interest that establishes justification for purposes of a tortious interference claim," *id.* (citing *Konecranes, Inc. v. Davis*, No. 1:12-cv-01700-JMS-MJD, 2013 WL 1566326, at *3 (S.D. Ind. 2013)), Defendants argue that Tyler's allegations "cannot form the basis of a tortious interference claim," *id.* at 10.

---

[6] Notably, the *Winkler* court eschewed endorsing the statement from the affirmed Court of Appeals decision that "[t]o satisfy this element of the tort, the breach must be malicious and exclusively directed to the injury and damage of another." *Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600 (Ind. Ct. App. 1993), *aff'd*, 638 N.E.2d 1228 (Ind. 1994).

Tyler responds that "competition is only proper justification when 'the actor does not employ wrongful means' and 'does not create or continue an unlawful restraint on trade.'" (Filing No. 58 at 14 (quoting *Restatement (Second) of Torts* § 768 (1979); *see also Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 877 (Ind. Ct. App. 1988) (adopting § 768).) Here, "Defendants employed wrongful means by orchestrating and implementing a scheme to rig the bidding process for various public works contracts, resulting in an unlawful restraint on trade." *Id.* At this motion-to-dismiss stage, Tyler maintains, the Court must accept "that defendants acted with intent to eliminate competition so that they could induce the breach of Tyler's contracts and line their own pockets"; but the question of "[w]hether defendants acted with a legitimate business purpose . . . is a factual inquiry" suited for a different time. *Id.* at 15. In any event, "Defendants' interest in 'competing' for the Counties' contracts would not in any way explain why they participated in the process of terminating Tyler and deliberately sought to have Tyler terminated immediately," Tyler adds. *Id.* at 16. As for precedent cited by Defendants, those cases involved conduct that was "in the spirit of competition," which is "the complete opposite" here: "Defendants worked to manipulate the bidding process, eliminate competition and competitors (not just Tyler, but all competitors), and ensure that Lexur's bid and price would win no matter what, even if lower and/or better bids might have been forthcoming in a normal, competitive process." *Id.* at 17 (citing *Konecranes*, 2013 WL 1566326, at *3).

In reply, Defendants contend that because "Lexur's conduct does not constitute 'bid rigging,' 'price fixing,' or any other *per se* anticompetitive conduct," Tyler "cannot rely upon allegations of that conduct to sustain its tortious interference claims." (Filing No. 64 at 12 (citing *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003)).) Moreover, while Tyler seemingly implies "that the fact that the Counties terminated their contracts

with Tyler and offered out-of-cycle bids is somehow wrongful conduct attributable to Lexur," the Complaint never alleges any facts illustrating how Defendants engaged in "improper conduct." *Id.* Instead of baldly proclaiming that Lexur "acted wrongfully," Defendants argue that "Tyler must allege how that conduct is somehow 'wrongful' such as making misrepresentations, applying unfair economic pressure, or threatened litigation which induced the Counties to breach their contracts." *Id.* at 13 (citing *Winkler*, 638 N.E.2d at 1235). Again, all the Complaint alleges, Defendants continue, is that "Lexur acted with the intent to obtain contracts with the Counties," but "pursuing one's own business interest is not 'without justification.'" *Id.* (citing *Konecranes*, 2013 WL 1566326, at *3). Unlike the cases it cites, Tyler "has not alleged any wrongful means other than the alleged 'unlawful restraint on trade' which fails as a matter of law." *Id.* at 13–14 (citing *Howmedica Osteonics Corp. v. DJO Global, Inc.*, 2018 WL 3130969, at *4 (S.D. Ind. Mar. 15, 2018) (allowing claim to proceed when complaint alleged that business interests were advanced using fraudulent misrepresentations, which had been specifically identified by the Restatement as an example of "wrongful means")).

Considering the parties' arguments, the *Winkler* framework, and the pertinent provisions of the Restatement, the Court concludes that Defendants' conduct was—as the Complaint itself alleges—justified because it was animated by a legitimate business purpose: to increase Lexur's business. Though Tyler alleges that Defendants tortiously interfered with the contracts by "encouraging, assisting, and supporting a conspiracy for the Counties to issue out-of-cycle requests for bids with an unusually short turnaround time and minimal notice," (Filing No. 1 at 29), it is unclear what specific wrongful conduct they performed to "manipulate" the Counties to issue the "out-of-cycle requests," (*see* Filing No. 58 at 5, 17). In other words, the Complaint does not allege through what wrongful means Defendants—who, according to the Complaint, had been mainly

constrained to doing business in Ohio (*see* Filing No. 1 at 6)—triggered the Counties into opening the rebid processes. *Cf. Winkler*, 638 N.E.2d at 1235–36 ("We begin our analysis with the observation that Winkler makes no contention that defendants' conduct was *malum in se*. . . . Winkler also does not suggest that defendants' motive was a willful or spiteful intent to injure him. . . . Winkler gives, and we perceive, no reasons why his contract interests should receive greater protection in tort law than the business interests sought to be advanced by defendants here."); *Restatement (Second) of Torts* § 768 cmt. e ("[P]hysical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure.").

Instead, Tyler merely maintains that Defendants "employed wrongful means by orchestrating and implementing a scheme to rig the bidding process for various public works contracts, resulting in an unlawful restraint on trade." (Filing No. 58 at 14.) But, as discussed above, Defendants did not rig bids, and the Court "will not invent legal arguments" for Tyler, *Cty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) (quotation omitted), that advance alternative modes of wrongful conduct in which Defendants may have engaged, *see also, e.g.*, *C.R. England v. Swift Transportation Co.*, 437 P.3d 343, 346, 353 (Utah 2019) (rejecting, following "a review of the caselaw from other jurisdictions," "that inducement of a breach of an existing contract constitutes improper means" in tortious interference claims). All told, because Tyler has failed to sufficiently allege "an absence of justification for the defendant's conduct," the Court **grants** Defendants' Motions to Dismiss as they relate to Count III.

**D.    Tortious interference with a business relationship**

In Count IV, Tyler brings a claim for tortious interference with a business relationship (Filing No. 1 at 29–30). Similar to tortious interference with a contract, a claim for tortious interference with a business relationship requires a plaintiff to plead "(1) the existence of a valid

relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *McCollough v. Noblesville Sch.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016) (citations omitted). But, different from above, this claim also "requires some independent illegal action." *Brazauskas*, 796 N.E.2d at 291 (citing *Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.*, 540 N.E.2d 131 (Ind. Ct. App. 1989)).

Defendants argue that not only does this claim fail because of the presence of justification for their conduct but also because there was no requisite independent illegal action. Yet the Court need not reach this second argument because this claim falters for the same reason as outlined above: Tyler's failure to allege the absence of justification. The Court, then, **grants** Defendants' Motions to Dismiss as they relate to Count IV.

### E.    <u>Civil conspiracy</u>

Finally, Tyler brings a claim against Defendants for civil conspiracy (Count VI) ([Filing No. 1 at 32](#)). "A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *Hall v. Shaw*, 147 N.E.3d 394, 407 (Ind. Ct. App. 2020) (quotations omitted). But civil conspiracy is not a freestanding claim; instead, it is "just another way of asserting a concerted action in the commission of a tort." *Id.* In short, "[c]ivil conspiracy must be alleged with an underlying tort." *Bd. of Trustees of Purdue Univ. v. Eisenstein*, 87 N.E.3d 481, 498 (Ind. Ct. App. 2017) (quotation omitted). Tyler alleges that Defendants "intentionally engaged in concerted action to violate federal and Indiana anti-trust laws and to tortiously interfere with Tyler's contractual and business relationships." ([Filing No. 1 at 32](#).)

Defendants argue that because "Tyler's civil conspiracy claim relies upon Lexur's alleged violation of federal and state antitrust laws, as well as its tortious interference claims"—and those

claims fail—Tyler "has no basis upon which to make its civil conspiracy claim." (Filing No. 30 at 12–13.)  In response, Tyler maintains that "[j]ust as [its] tort claims survive these Motions, so too does its civil conspiracy claim." (Filing No. 58 at 19.) In reply, Defendants rejoin that "[b]ecause Tyler's claims for tortious interference with contract and tortious interference with business relationships both fail, so [must] Tyler's civil conspiracy claim."  (Filing No. 64 at 14.)  At this stage of the litigation, the life of Tyler's civil conspiracy claim rises and falls with the continued viability of its underlying tort claims.  Because no underlying tort claim survives the Motions to Dismiss, the Court **grants** Defendants' Motions as they pertain to Count VI.

### IV.     <u>CONCLUSION</u>

For the reasons outlined above, the Court **GRANTS** the Defendants' Motions to Dismiss (Filing No. 29; Filing No. 31). Tyler's claims are **dismissed without prejudice**.[7]  Tyler shall have **fourteen (14) days** from the date of this Entry to file an amended complaint, if such a filing is not an exercise in futility.  If nothing is filed by that date, final judgment will issue.

**SO ORDERED.**

Date:  6/29/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ann O. McCready
TAFT STETTINIUS & HOLLISTER LLP
amccready@taftlaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP
vhadley@taftlaw.com

---

[7] "When a complaint fails to state a claim, the plaintiff ordinarily should receive at least one opportunity to amend it, unless an amendment would be futile." *Olrich v. Kenosha Cty.*, 825 F. App'x 397, 400 (7th Cir. 2020) (citing *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015)).

Jennifer J. Nagle
K&L GATES LLP
jennifer.nagle@klgates.com

Michael R. Creta
K&L GATES LLP
michael.creta@klgates.com

A. Richard M. Blaiklock
LEWIS & WAGNER LLP
rblaiklock@lewiswagner.com

Aaron D. Grant
LEWIS & WAGNER LLP
agrant@lewiswagner.com

John Carl Trimble
LEWIS & WAGNER LLP
jtrimble@lewiswagner.com

Chelsea R. Stanley
STITES & HARBISON, PLLC (Jeffersonville)
cstanley@stites.com

Douglas B. Bates
STITES & HARBISON, PLLC (Jeffersonville)
dbates@stites.com