## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | |
|---|---|
| TYLER TECHNOLOGIES, INC.,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. |
| ) | 4:20-cv-00173-TWP-DML |
| LEXUR ENTERPRISES INC., ROBERT FRY,  ) | |
| AND DANIEL MUTHARD  ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants.  ) | |
| ) | |

### AMENDED COMPLAINT

Plaintiff Tyler Technologies, Inc. ("Tyler") files the following complaint against Lexur Enterprises Inc. ("Lexur"), Robert Fry ("Fry"), and Daniel Muthard ("Muthard") (collectively, the "Defendants"). Tyler brings claims against Defendants for (1) trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, (2) trade secret misappropriation under Ind. Code § 24-2-3-2, *et seq.*, (3) conversion, (4) aiding and abetting breaches of fiduciary duty, (5) tortious interference with contract, (6) tortious interference with business relationships, and (7) civil conspiracy.

### INTRODUCTION

1.  Defendants engaged in a concerted scheme to misappropriate and convert Tyler's confidential business information, trade secrets, and goodwill to maliciously and intentionally interfere with Tyler's public works contracts with various Indiana counties — contracts that Lexur wanted for itself but could not successfully and competitively obtain without exercising wrongful and deceitful means.

2.      Relevant here are the Indiana counties of Dearborn, Floyd, Jackson, Jefferson, Ripley, and Switzerland (collectively, the "Counties").  Tyler has been under contract for cyclical reassessment services with each of the Counties since at least 2014 (and for some of the Counties, since as far back as 2009).  Pursuant to these contracts, Tyler helps the Counties systematically reassess the value of the property within their jurisdictions to ensure that property taxes are calculated appropriately.

3.      As their name implies, cyclical reassessments occur on a cyclical basis — specifically, on four-year cycles, with 25% of the properties within a county reassessed each year. Counties issue requests for bids for cyclical reassessment contracts in the year prior to a four-year cycle.

4.       In 2017, the Counties issued public requests for bids for cyclical reassessment contracts for the 2018–2022 cycle.  Tyler submitted bids for those contracts in each of the Counties. Lexur submitted bids in at least Jefferson and Switzerland Counties.

5.      Tyler was awarded the contracts by each of the Counties (collectively, the "Contracts" or "2017 Tyler Contracts"), including but not limited to Jefferson and Switzerland Counties, where Tyler's bids were selected over Lexur's bids.

6.      In the ordinary course, bids for the next cycle (2022–2026) would be solicited in 2021.

7.       Rather than working towards improving its own competitive position for bidding on the 2022–2026 cycle (for example, improving its offerings, honing its pricing, or strengthening the qualifications of its staff), Defendants launched a premeditated, malicious, and intentional scheme in early 2020 designed to misappropriate Tyler's goodwill and trade secrets and interfere

with Tyler's Contracts and manipulate the public bidding process.  Defendants' scheme, which was complex and involved various steps, is referred to herein as the "Rebid Conspiracy."

8.      The Rebid Conspiracy turned on Defendants' ability to induce the Counties to rebid the Contracts surreptitiously mid-cycle and commit to awarding the Contracts to Lexur as the sole bidder, ensuring no other competitors (including Tyler) would have an opportunity bid against Lexur.  To do that, among other things, Defendants had to: (i) promise the Counties services similar to those that Tyler was providing, but at a lower price; (ii) have the staff to actually service the Contracts; and (iii) know how to bid lower than Tyler's existing Contract pricing in a way that was commercially feasible and could actually be implemented by Lexur.

9.      Lexur could not do any of that successfully without stealing Tyler's goodwill and trade secrets, and enlisting current Tyler employees as participants in the scheme — which Defendants of course knew would violate those employees' duties of loyalty to Tyler by acting directly against Tyler's interests.

10.     As in 2017 when Lexur unsuccessfully bid on certain of the Contracts, Lexur still had no meaningful relationship with the Counties in 2020.  Lexur also did not have sufficient or qualified staff to perform the work that the Counties needed, such that it was not positioned to bid at all, let alone competitively.  To overcome this first roadblock to execution of the Rebid Conspiracy, Defendants elected to misappropriate and convert Tyler's own goodwill with the Counties.

11.     Lexur conspired with two Tyler employees in charge of Tyler's performance under the Contracts — Jimmy Davis (a/k/a Jim Davis) ("Davis") and Joe Thornsberry (a/k/a Shane

Thornsberry) ("Thornsberry")[1] — to misappropriate Tyler's goodwill with the Counties to convince them to rebid the contracts mid-cycle, terminate their contracts with Tyler in breach of the contract terms, and grant the rebid contracts to Lexur.

12.     Davis and Thornsberry were very specifically selected by Defendants to be participants in the Rebid Conspiracy, because they had developed positions of trust with the Counties, *on Tyler's behalf and at Tyler's expense*.  Specifically, Davis and Thornsberry *managed* all of the Counties' services under the Contracts, with the help of their assigned Tyler staff.  The Counties relied upon Davis and Thornsberry (and the Tyler employees on their teams) for day-to-day service under the Contracts.  Defendants' entire plan hinged on misappropriating those relationships for Lexur's benefit.  For several months of *their employment with Tyler*, Davis and Thornsberry, *working with and at the direction of Defendants*, but while being paid by Tyler, helped to plan and launch the Rebid Conspiracy for the benefit of Lexur and the detriment of Tyler.

13.     Lexur promised Davis and Thornsberry jobs at Lexur for not just them, but the other Tyler employees assigned to Davis's and/or Thornsberry's teams for the Counties.  This was because Defendants could not convince the Counties to rebid and did not have the proper staff or commercial know-how to actually service the Contracts without manipulating, using, and taking Tyler's staff and trade secrets.

14.     Knowing they would have to recruit away all of Tyler's staff working on the Contracts, Defendants stole Tyler's trade secret salary and compensation strategy information for the relevant Tyler teams.  Armed with Tyler's trade secret compensation details and strategy, information developed by Tyler over time and at great expense, and held secretly by Tyler for its

---

[1]     Tyler originally brought claims against Davis and Thornsberry in this action.  *See* Complaint, Dkt. No. 1.  Those claims were subsequently settled and dismissed by stipulation. *See* Order of Dismissal (Thornsberry), Dkt. No. 63; Order of Dismissal (Davis), Dkt. No. 67.

own competitive advantage, Lexur knew exactly what to offer all of Tyler's relevant staff. Defendants used that trade secret information to make employment offers to Davis, Thornsberry, and other Tyler staff, so that Defendants were armed to follow through with the Rebid Conspiracy.

15.     With Davis and Thornsberry induced to violate their fiduciary duties of loyalty and act undercover for Lexur while still Tyler employees, and with misappropriated Tyler trade secrets enabling Lexur to recruit the staff it needed, Defendants told the Counties that the teams who did their work under the Contracts would be leaving Tyler to join Lexur.  Lexur did this to convince the Counties that they had no real option but to rebid, terminate Tyler, and award contracts to Lexur to maintain consistent service.  And to calm any concerns the Counties had about the propriety of this conduct, Defendants promised they could do the work for a lower price than Tyler and used Davis and Thornsberry — and *Tyler's* goodwill with the Counties — to falsely assure the Counties that the Rebid Conspiracy was legitimate and appropriate.

16.     Five of the six Counties — Dearborn, Floyd, Jefferson, Ripley, and Switzerland — were initially convinced to go along with Defendants' plan.  The Jackson County Assessor declined to participate.

17.     Having misappropriated and leveraged Tyler's goodwill and trade secrets to convince Dearborn, Floyd, Jefferson, Ripley, and Switzerland Counties to participate in the Rebid Conspiracy, and having used Tyler's trade secret compensation information to position itself to recruit the staff necessary to actually service the Counties' contracts, Lexur still had one problem — how to beat Tyler's pricing?

18.     To do that, Lexur simply continued along with the theme of the Rebid Conspiracy — deceit and theft.  Defendants solicited and obtained from Davis — *while he was still a Tyler employee* — Tyler's project planning calendars; detailed fee, budget, and progress of completion

information; and business strategy information regarding Tyler's implementation and pricing of the Contracts.  Lexur engaged in repeated exchanges of this information with Davis, fully aware of its confidential nature and of the fact that Davis was breaching his fiduciary duty of loyalty to Tyler each time he acquiesced.

19.     Importantly, while the final pricing on the Contracts is public record, how to price these types of contracts in a competitive way that is also commercially feasible for the service provider is a competitively sensitive endeavor.  By misappropriating Tyler's internal pricing and planning documents and information, Lexur had access to the nuances and details of how Tyler develops its pricing — with a service-by-service, resource-by-resource, expense-by-expense level of granularity that is fundamental to Tyler's competitive pricing strategy.  This is information that Tyler has developed over time and at great expense, and that Tyler maintains in strict confidence and protects from disclosure.

20.     The level of pricing and planning detail that Lexur misappropriated is highly sensitive for many reasons, including reasons that the Rebid Conspiracy highlights: having access to it allows a competitor — here, Lexur — to assess not just what its price needs to be, but how it can lower its price while still being able to deliver under a contract.  The details misappropriated by Lexur gave it a roadmap, for example, to what expenses or services could be adjusted to cut costs that Tyler cannot avoid, and highlighted opportunities for no-cost services that would directly and materially allow a competitor to distinguish its offering from Tyler's.

21.     Lexur, of course, did not have its own experience and strategy information for pricing and implementing Indiana cyclical reassessment contracts, because it had never provided services in Indiana before.  Its only option for securing the contracts was to steal Tyler's information to do so.

22.     With Tyler's trade secrets in hand, Lexur used that information to prepare its bids for the Counties, specifically to prepare a bid that was priced lower than the Contracts, but that Lexur could actually deliver.   Upon information and belief, Lexur has continued to use Tyler's trade secret information in connection with other bids for reassessment work in Indiana, Ohio, and possibly elsewhere.

23.     Having recruited the involvement of Davis and Thornsberry to breach their duties to Tyler, and having misappropriated and used Tyler's goodwill and trade secrets to prepare itself to actually staff and service the Contracts, Defendants worked with the five Counties that agreed to participate to: (i) draft the rebid documents themselves, (ii) plan the timing of the rebids, to ensure they fell before the 4th of July holiday with minimal turn-around time so that competitors like Tyler would be unaware and unable to bid, (iii) ensure that Lexur would be the only bidder, and (iv) draft the termination notices for use by the Counties.  All the while, upon information and belief, Defendants coached at least Davis to deny any knowledge of the rebids to Tyler, once again fully aware that lying to his employer was a direct breach of Davis's duty of loyalty to Tyler.

24.     Ultimately, three of the five Counties that initially participated went on to rebid and award their contracts to Lexur on what was essentially a no-bid basis.  Despite the dishonest and unfair process underlying the rebids, those Counties purported to terminate Tyler's Contracts "for convenience" and "immediately," in breach of the Contracts' terms.  The other two Counties were only prevented from awarding their contracts to Lexur due to a significant undertaking by Tyler to expose then-available details of the Rebid Conspiracy in advance of the rebid awards by the County Commissioners.

25.     Upon learning of the rebids and despite Davis lying to Tyler about them at Defendants' direction, Tyler eventually realized that something was afoot, suspicions that were solidified when Davis abruptly resigned on July 6, on the heels of Tyler learning about the rebids.

26.     Tyler was then forced to expend significant resources to investigate and to hire counsel to advise on and protest the surreptitious rebids with each of the Counties, including to invoke the dispute resolution processes set out in the Contracts.  Ultimately, in light of the Rebid Conspiracy and the County Commissioners' appreciation of Lexur's true motivations and conduct, those efforts were successful and the Counties that had awarded contracts to Lexur revoked those contracts and reinstated their Tyler contracts.

27.     Notwithstanding that Tyler's extensive efforts were successful in demonstrating to the Counties the improper means by which Lexur had convinced them to terminate the Contracts, Tyler has been harmed by Defendants' wrongful conduct, including but not limited to the extensive costs and resources expended to address the Rebid Conspiracy with all of the Counties.  Even for Counties that ultimately did not award Lexur contracts, Tyler suffered damages due to the significant effort and expense undertaken to reach that result, i.e. the effort and expense of engaging with the Counties and educating them regarding the extent and nature of Lexur's misconduct, reassuring them about Tyler's uninterrupted ability to continue to perform under the Contracts, and continuing that performance in a timely fashion despite the interruptions caused by the Rebid Conspiracy.

28.     Tyler also suffered significant business disruption, theft of its trade secrets and resulting losses by virtue of Lexur's use of those trade secrets, damage to its goodwill with the Counties, and lost salary and compensation paid to Davis and Thornsberry while Defendants were

using them to misappropriate Tyler's goodwill and trade secrets and aiding and abetting their breaches of their duty of loyalty.

29.     Tyler is entitled to compensatory damages, punitive damages, exemplary damages, costs, and reasonable attorney's fees.

## PARTIES

30.     Tyler is a software company that focuses on providing integrated software and technology services to the public sector.  Tyler offers four solution groups, including Public Administration, Courts and Public Safety, K-12 Education, and Transformative Technology. Within Tyler's Public Administration solutions, Tyler provides solutions for the core functions of government: appraisal, tax collections, records, community development, utility billing, asset maintenance, finance, and administration.  Tyler provides appraisal and tax services to jurisdictions across the country.  Since launching in 1938, Tyler's appraisal and tax business has set the industry standard for integrated tax assessment software and services.  Tyler's experience and expertise are confirmed by, among other things, the market presence it enjoys in Indiana (where Tyler provides services to over twenty-five Indiana counties).  Tyler is a Delaware corporation with headquarters located at 5101 Tennyson Parkway, Plano, Texas 75024.

31.     Lexur, acting through its Lexur Appraisal Services operating division, is a regional competitor of Tyler.  Lexur is an Ohio corporation with headquarters located at 7755 Paragon Road, Suite 109, Dayton, Ohio 45459.

32.     Robert Fry is the President and Chief Financial Officer of Lexur.  Fry was fully aware of, engaged in, and assisted in orchestrating the Rebid Conspiracy, including direct involvement in the misappropriation of Tyler's goodwill and trade secrets.  On information and belief, Fry currently resides at 6608 Green Park Drive, Dayton, Ohio 45459.

33.     Daniel Muthard is the Chief Executive Officer of Lexur.  Muthard was fully aware of, engaged in, and assisted in orchestrating the Rebid Conspiracy, including direct involvement in the misappropriation of Tyler's goodwill and trade secrets.  On information and belief, Muthard currently resides at 914 Foxtail Circle, Tipp City, Ohio, 45371.

## JURISDICTION AND VENUE

34.     This Court has personal jurisdiction over Lexur because Lexur has conducted or solicited business in Indiana that has given rise to Tyler's claims, has committed tortious and illegal acts in Indiana, and has maintained continuous and systematic contacts within Indiana.

35.     This Court has personal jurisdiction over Fry because, at all relevant times, Fry has served as the President and Chief Financial Officer of Lexur, has conducted or solicited business in Indiana on Lexur's behalf that has given rise to Tyler's claims, and has committed tortious and illegal acts in Indiana.

36.     This Court has personal jurisdiction over Muthard because, at all relevant times, Muthard served as Chief Executive Officer of Lexur, has conducted or solicited business in Indiana on Lexur's behalf that has given rise to Tyler's claims, and has committed tortious and illegal acts in Indiana.

37.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Tyler's claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, raises a federal question.  Pursuant to 28 U.S.C. § 1367, Tyler's remaining claims fall within this Court's supplemental jurisdiction because they are so related to the federal claim that they form part of the same case or controversy.

38.     This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because diversity exists among the parties and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

39.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to this dispute occurred within this District.

**FACTUAL BACKGROUND**

**I.     Tyler's 2018–2022 Cyclical Reassessment Contracts With The Counties.**

40.     Under Indiana law, Indiana County Assessors are required to physically inspect and reassess the value of all real property within their county over the course of four years.  During each year of a four-year cycle, 25% of properties within the county are reassessed.  Once all of the properties within a county have been reassessed, a new four-year cycle begins.  This process is commonly known as a "cyclical reassessment."

41.     Indiana County Assessors regularly engage private contractors to provide support and advice in connection with cyclical reassessments.  To engage such contractors, Indiana County Assessors are required by Indiana law to advertise for bids.  Bids are typically solicited in the year prior to the start of a new four-year cycle.

42.     The current cyclical reassessment period started on May 1, 2018, and is scheduled to end on April 30, 2022.  Relevant here, the Indiana counties of Dearborn, Floyd, Jackson, Jefferson, Ripley, and Switzerland, i.e. the Counties, each solicited bids for such 2018–2022 cycle in the late spring of 2017.

43.     A vendor's response to a request for bids involves internal analysis of the work to be performed, its technical and operational capabilities, staffing strategies, and other commercial considerations in order to prepare a competitive bid that is economically and commercially feasible.  To enable it to competitively bid for public work contracts like the cyclical reassessment contracts for the Counties, Tyler maintains sensitive trade secret information, including historical

and current information on pricing, staffing, and technical and operational strategies, and analyses of same, which allows Tyler to submit competitive bids that are also commercially prudent.  Tyler must balance aggressive pricing with proposing a responsible and reasonable scope that addresses the requests and requirements of the request for bids, while also allowing Tyler the ability to function as an ongoing and profitable business.  Tyler's strategy in striking that balance is one that Tyler has developed, improved upon, and protected over time.

44.     Tyler submitted bids in response to the Counties' 2017 solicitations and was ultimately awarded the work for each of the Counties.

45.     Lexur also submitted bids in response to at least some of the Counties' 2017 solicitations but was not awarded any of the resulting contracts, even though Lexur proposed lower prices than Tyler's.  Lexur lost each bid it submitted in part due to Lexur's complete lack of experience providing assessment services in Indiana.

46.     After winning the work, Tyler entered into cyclical reassessment contracts with each of the Counties in the summer of 2017, i.e. the Contracts.

47.     Under the terms of the Contracts, a County can only terminate for convenience if termination is in the County's "best interest."  Additionally, a County's termination of services for convenience must be "effected by delivery to [Tyler] of a Termination Notice at least thirty days prior to the termination effective date specifying the extent to which performance of services under such termination becomes effective."  Further, Tyler must be "compensated for services properly rendered prior to the effective date of termination."

48.     Tyler fully performed its obligations under the Contracts.  Each quarter, the Counties conducted reviews of Tyler's services and Tyler never received any negative feedback.

In fact, Davis was responsible for reporting the Counties' feedback to Tyler and never indicated to Tyler that the Counties were dissatisfied with Tyler's services.

## II.     Tyler Protects Its Confidential Business Information And Trade Secrets.

49.     Tyler expends substantial time, effort, and expense developing confidential business information and trade secrets.  Tyler's business and its continued success depends on the protection of such confidential business information and trade secrets.

50.     Tyler's confidential business information and trade secrets include, among other things, information related to Tyler's performance of reassessment services.  This information encompasses, but is not limited to, information related to Tyler's processes for appraising new construction, annual data verification, trending, monthly billing, and fees.  Additionally, Tyler's confidential business information and trade secrets include Tyler compensation and benefits strategy information, which enables it to competitively secure talent to perform the services required under reassessment contracts.  This is particularly important because of the need in Indiana for staff with particular and unique certifications.

51.     Tyler carefully monitors and restricts access to its confidential business information and trade secrets.  For example, among other protections, Tyler (1) requires its employees to abide by confidentiality obligations contained in the Tyler employee handbook and confidentiality agreements; (2) limits access to its confidential business information and trade secrets to employees who have a need to know such information; (3) conducts annual security training that includes refresher training on protecting confidential information; (4) requires user logins and multi-factor authentication for certain information that is electronically stored; (5) regularly defends against public disclosure in response to public records FOIA requests for commercially sensitive information; and (6) as a matter of course when an employee leaves Tyler, requires confirmation that they have returned all Tyler confidential information.

52.     Tyler's confidential business information and trade secrets are not generally known in the property reassessment services industry or outside of Tyler, and could not be learned or independently developed by others, if at all, without considerable expenditure of time, effort, and expense.

53.     Tyler's confidential business information and trade secrets are materially valuable to Tyler because Tyler derives independent economic value from the information not being made public, and any Tyler competitor who acquired such information would be given an unfair competitive advantage.  Such a competitor would be able to improperly take advantage of years of valuable accumulated knowledge.

54.     The value of Tyler's confidential business information and trade secrets is particularly high as to the Counties because Tyler has been working with each of them for many years, and has developed insight and intelligence into the Counties' challenges, preferences, and needs.  That information is not available to others, is maintained and analyzed by Tyler to maximize its work and productivity for the Counties, and would give any competitor an unfair advantage if improperly accessed.

**III.     Tyler Employees Davis And Thornsberry Were Responsible For The Counties.**

55.     Davis started work for Tyler on January 29, 2009.  He was promoted to Senior Appraisal Projects Supervisor on or about February 21, 2015.  From at least February 21, 2015 through July 6, 2020, Davis had responsibility over four of the Counties — Ripley, Dearborn, Floyd, and Jackson.  During this same time, Davis also had responsibility over the other two Counties — Switzerland and Jefferson — until responsibility for those two counties transferred to Thornsberry on February 15, 2020.

56.     Thornsberry started work for Tyler on April 13, 2009.  From approximately February 2015 to February 15, 2020, reporting to Davis, Thornsberry was assigned to perform work for two of the Counties — Switzerland and Jefferson.  He was promoted to Associate Project Supervisor on or about February 15, 2020, and became the primary project manager responsible for those Counties, through July 10, 2020.

57.     In connection with his most recent promotion, on March 4, 2020, Thornsberry entered into a written agreement with Tyler that contained certain restrictive covenants (the "Restrictive Covenant Agreement").

58.     Pursuant to the Restrictive Covenant Agreement's terms, Thornsberry agreed to the following (among other things):

> [F]or the one-year period following the termination of [Thornsberry's] employment, for any reason, [Thornsberry] shall not (a) contact, call upon, solicit, or perform services competitive with those of Tyler as to any customer of Tyler for whom [Thornsberry] provided services or solicited, called on, or marketed on behalf of Tyler during the final two years of [Thornsberry's] employment with Tyler, or (b) recruit, solicit or hire, or encourage or assist other persons or entities to recruit, solicit or hire, any employees of Tyler.

59.     Tyler requires its employees to review and acknowledge the Tyler Employee Handbook on an annual basis.  Most recently, Davis and Thornsberry both acknowledged receiving and reviewing Tyler's 2020 Employee Handbook on May 7, 2020, the last annual review applicable to them prior to their respective departures from Tyler.

60.     Among other things, by acknowledging Tyler's 2020 Employee Handbook, Davis and Thornberry agreed and acknowledged as follows:

> a.     Tyler expects the **undivided loyalty of its employees** in the conduct of business.  It is important that employees be free from any financial interests or other relationships that might conflict with the best interests of Tyler.  Accordingly, each employee shall avoid any investment or other interest in any business that would conflict with the proper performance of their duties or responsibilities for Tyler, or which might interfere with their

independence of judgment with respect to the transactions between Tyler and such other business.

b.      Tyler expects all officers, directors, and employees to exercise the **highest degree of professional business ethics** in all actions they undertake on behalf of Tyler.

c.      The **use of any Tyler assets for any unlawful or improper purpose is strictly prohibited**.

d.      The use of Tyler employees, materials, or equipment for personal purposes is strictly prohibited, unless specifically authorized.

e.      Tyler's employees, clients, vendors, and shareholders entrust [Tyler] with certain confidential information relating to their business activities.  The nature of this relationship **requires Tyler employees to strictly comply with their confidentiality obligations, even after they leave employment with Tyler.**

f.      As an employee, you have a responsibility to **avoid unnecessary and/or impermissible disclosure of confidential, proprietary information about Tyler, its clients, and/or its vendors.**

g.      You are not to discuss with the officers, directors, or employees of competing companies any topic that might give the impression of an illegal agreement in restraint of trade.  Such topics include, but are not limited to, pricing agreements, client allocation, and division of sales territories.

h.      **Under no circumstances should confidential information be disclosed or revealed within or outside the company without proper authorization or for a permitted purpose**.

## IV.     Defendants — With Davis's And Thornsberry's Inside Tyler Knowledge And Goodwill With The Counties — Execute The Rebid Conspiracy.

### a.      *Planning the Rebid Conspiracy*

61.     Defendants were working with Davis, Thornsberry, and, upon information and belief, other Tyler employees, for months to prepare for, plan, and implement the Rebid Conspiracy.

62.     Although Davis and Thornsberry were Tyler employees with contractual and/or common law duties to Tyler — duties Defendants were well aware of — Defendants nonetheless engaged Davis and Thornsberry in these efforts to help Lexur and damage Tyler right under Tyler's

nose, using Tyler's goodwill and relationships with the Counties, as well as Tyler's confidential business information and trade secrets.

63.     On or about May 20, 2020, Fry met with Davis to solicit Davis to work undercover at Tyler in breach of its fiduciary duties to help Defendants interfere with Tyler's Contracts by convincing the Counties to rebid and award the work to Lexur.  Davis would then leave Tyler with his staff to join Lexur.

64.     Following Fry's and Davis's May 20, 2020 meeting, Davis— *as a Tyler employee*— called the Jackson County Assessor and asked if Jackson County would be willing to rebid its cyclical reassessment contract mid-cycle.  Davis plainly indicated that he was planning to leave Tyler and join another company (Lexur).  In other words, Davis reached out to his contact in Jackson County — a relationship developed for Tyler and at Tyler's expense — to ask her to rebid the contract and give the work to a competitor that he hoped to join.  The Jackson County Assessor rejected the idea of rebidding the contract, the only one of the Counties to do so.

65.     Undeterred after the Jackson County Assessor's rejection of the Rebid Conspiracy, Defendants continued to solicit the other Counties.  On information and belief, the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn engaged with Defendants' outreach, at least initially, as evidenced by early written documentation of the Rebid Conspiracy.

66.     While misappropriating and leveraging Tyler's goodwill, through Davis and Thornsberry, to convince the Counties to rebid and terminate Tyler's Contracts, Defendants were also actively soliciting, receiving, and using a substantial amount of confidential Tyler business information and trade secrets in order to effectuate the Rebid Conspiracy.

67.     In or about May 2020, for example, Defendants requested from Davis, and then received and analyzed, detailed Tyler confidential business information and trade secrets related

to Tyler's processes for appraising new construction, annual data verification, trending, and monthly billing for the Counties — essentially, Tyler's internal business and strategy planning for how to efficiently and cost-effectively implement the Contracts within the contracted-for amounts. Davis also provided Defendants with Tyler confidential business information and trade secrets related to Tyler compensation strategy. Fully aware of its confidential nature, Muthard thanked Davis for sending the information to Defendants.

68.     Shortly after receiving the confidential business information and trade secrets from Davis, Defendants adapted it for their own purposes and use in the Rebid Conspiracy. Muthard sent Fry multiple spreadsheets containing and modifying Tyler confidential business information and trade secrets for Lexur use in preparing its responses to the Counties' anticipated rebids.

69.     As early as June 2, 2020, Defendants had also committed the details of the Rebid Conspiracy to writing. On that date, Fry and Muthard exchanged correspondence with Davis — still a Tyler employee as Defendants well knew — that attached (1) a calendar outlining the timeline of events for the Rebid Conspiracy (the "Calendar"), and (2) a draft termination notice for the Counties to send to Tyler to terminate their respective contracts (the "Draft Termination Notice"). A true and accurate copy of the June 2, 2020 email with its attachments is attached as Exhibit A.

70.     The Calendar specifically referenced the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn (the five Counties that had agreed to go along), and provided a day-by-day plan for the Rebid Conspiracy: the Counties' short notice and minimally publicized release of the request for bids right before and/or directly over the Fourth of July holiday; the intentional scheduling of the close of bids to occur immediately or just before the next regularly scheduled county commissioners meetings (at which Lexur would be awarded the contracts as the

only bidder and Tyler termination notices would be signed); termination of Tyler's contracts with the Counties; the resignation of "all Staff" at Tyler working on the Counties' projects and "All Activities" on those Counties halted; the subsequent transition of that Tyler staff to Lexur; and Lexur to pick up operations on the Counties under their new contracts.

71.     The Calendar quite literally speaks for itself:



72.     Defendants were driving forces behind the plan outlined in the Calendar. Each aspect of the Rebid Conspiracy outlined in the Calendar necessarily involved Lexur and its leaders, Fry and Muthard, as well as Davis and Thornsberry (*then still Tyler employees*) — being prepared for the otherwise secretive rebids, preparing Lexur's bids with Tyler's trade secrets, attending the county commissioner meetings to be awarded the contracts, and ultimately hiring Davis, Thornsberry, and "All Staff" from Tyler (having recruited them with Tyler trade secret information).

73.     Muthard called the Calendar "very helpful."

74.     Two days after circulation of the Calendar, and with Tyler's confidential business information and trade secrets in hand, Muthard met with Davis to gather even more Tyler confidential information for use in the Rebid Conspiracy.   Notes from the meeting reflect that Lexur requested and received confidential information regarding Tyler's billing arrangements, processes, and equipment.  Muthard also discussed Tyler staff leaving Tyler to join Lexur in order to ensure adequate staffing to complete the reassessment work if the Rebid Conspiracy was successful.

75.     While these discussions were ongoing, Defendants were aware that Davis, Thornsberry, and other Tyler employees had confidentiality obligations, as well as contractual and common law duties — including the fiduciary duty of loyalty — to Tyler.  Davis even sent Defendants a copy of Tyler's form confidentiality obligations language, and Fry acknowledged in writing to Davis and Muthard that "[w]e need to be careful about what information is shared going forward."

76.     Defendants' planning of the Rebid Conspiracy continued, sharing updates among themselves and with Davis and Thornsberry about progress of meetings with the Counties, continuously updating planning calendars for the Rebid Conspiracy as the conspiracy unfolded, and drafting bid notices and specifications for the Counties to issue, all while Davis and Thornsberry remained *Tyler employees*.

77.     Davis's and Thornsberry's inside role as Tyler employees and misappropriation of Tyler's goodwill with the Counties was critical to Defendants' execution of the final steps of the Rebid Conspiracy.  Indeed, the Draft Termination Notice circulated by and between Davis and Thornsberry on June 2, 2020, and authored by Davis, was also a key component of the Rebid

Conspiracy.  That Draft Termination Notice was shared with Lexur, Fry, and Muthard, and was ultimately provided to and used by certain of the Counties to terminate the 2017 Tyler Contracts.

78.     With the Calendar and Draft Termination Notice in the works, and the Counties of Jefferson, Ripley, Switzerland, Floyd, and Dearborn in play, Defendants were well on their way to implementing the Rebid Conspiracy.

79.     Defendants even tried again to persuade Jackson County to engage in the Rebid Conspiracy.  On June 8, 2020, Jennifer Bippus ("Bippus"), a Lexur employee, sent an email to the Jackson County Assessor asking if she was available for a meeting on the afternoon of June 9, 2020.  Bippus also stated that she would be "visiting [the Ripley County Assessor] and possibly Switzerland county" on the morning of June 9, 2020.  The Jackson County Assessor did not respond to Bippus's June 8, 2020 email, but Defendants were still not dissuaded.  Davis subsequently called the Jackson County Assessor *on Lexur's behalf* (and while still a Tyler employee) and asked her to meet with Bippus.  The Jackson County Assessor rejected Davis's request once again and said that she was not interested in meeting with Lexur.

80.     Further communications between and among Defendants, Davis, and/or the Counties over the next week reflect the continued refinement of the Rebid Conspiracy.

81.     On June 15, 2020, Davis sent an email (from his personal email address) to Thornsberry (at his personal email address) attaching (1) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Switzerland County, (2) a draft request for cyclical reassessment bids for Switzerland County, (3) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Jefferson County, and (4) a draft request for cyclical reassessment bids for Jefferson County.  In that email, Davis asked Thornsberry to "carefully review [the email's attachments] for any error [*sic*] or omissions":

From:           Shane Thornsberry <shanethornsberry@gmail.com>
Sent:           Wednesday, June 17, 2020 11:29 AM
To:             Thornsberry, Shane
Subject:        Fwd: jeff plan calendar
Attachments:    REBID - Switzerland 2022 Cyclical Reassessment_Notice to Bidders.doc; REBID -
                Switzerland County IN 2022 Cyclical Reassessment RFB.doc; REBID - Jefferson 2022
                Cyclical Reassessment_Notice to Bidders.doc; REBID - Jefferson County IN 2022 Cyclical
                Reassessment RFB.doc

---------- Forwarded message ----------
From: **Jim Davis** <jdavisdsl@frontier.com>
Date: Monday, June 15, 2020
Subject: jeff plan calendar
To: Shane Thornsberry <shanethornsberry@gmail.com>

Shane,

Please carefully review these for any error or omissions.

Notes:

1.)  All totals are as of 6/5

2.)  Data entry has been omitted from Jefferson for cost reduction

3.)  Performance retainer in lieu of bond for cost reduction

4.)  Increased parcel count due to adding unimproved parcels yields a decreased price per parcel.

82.    As evidenced by their file properties, Davis authored the four attachments.  The draft notices to bidders for Switzerland County and Jefferson County attached to the email both state that bids will be accepted until July 6, 2020, which is the same day the Calendar identifies as the deadline to "Submit All Bids."

83.    The text of Davis' June 15, 2020 email directly evidences the misappropriation and use of Tyler's trade secrets.  The "Notes" reflect manipulation of Tyler's pricing strategy in order to yield distinguishing cost reductions for each bid by Lexur.

84.    On Defendants' behalf, Davis also sent an email from his personal email address to the Ripley County Assessor on June 15, 2020 attaching (1) a draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Ripley County and (2) a draft request for

cyclical reassessment bids for Ripley County.  The draft notice states that bids will be accepted until "10:00 A.M. EST the 1st [sic] of July 6, 2020[.]," once again consistent with the Calendar.

85.     On June 16, 2020, Davis sent Defendants copies of the draft notices to bidders and draft specifications for the Counties to issue as part of the Rebid Conspiracy.

86.     On June 16, 2020, again on Defendants' behalf, Davis sent another email from his personal email address to the Ripley County Assessor.  This email attached (1) a revised draft notice to bidders relating to the anticipated rebid for cyclical reassessment services for Ripley County and (2) a revised draft request for cyclical reassessment bids for Ripley County.  In this set, Davis corrected the typographical error referenced in the preceding paragraph, such that the revised draft notice attached to the June 16 email states that bids will be accepted until "10:00 A.M. EST July 6, 2020[.]"

87.     The foregoing reflects that Defendants, working with Davis and Thornsberry, drafted the very notices and requests for bids that the Counties were to issue to surreptitiously rebid cyclical reassessment services while their contracts with Tyler were mid-cycle, as well as the termination notices that the Counties were to issue later upon awarding the contracts to Lexur and terminating Tyler mid-contract.

88.     Defendants also continued to solicit, receive, and use Tyler confidential business information and trade secrets from Davis — despite having recognized that they "need[ed] to be careful about what information is shared" between Davis and Defendants.

89.     For example, in late June 2020, Davis provided Fry with detailed, confidential Tyler fee information concerning the Counties.  Notably, all of this information was conspicuously marked "CONFIDENTIAL."  Fry then forwarded this confidential Tyler business information and trade secrets to Muthard's personal email account (d.muthard@roadrunner.com).      The

misappropriation continued into late June, when Davis provided Fry with more detailed, confidential Tyler fee information concerning the Counties, information that Fry promptly forwarded to Muthard's personal email account.

90.     Defendants continued to receive and use other Tyler confidential business information and trade secrets related to Tyler's reassessment work for the Counties from Davis.

91.     As reflected by the above, Defendants actively relied upon and encouraged Tyler employees to breach their contractual and common law duties to Tyler and misappropriated Tyler confidential business information and trade secrets.

### b.     *Executing The Rebid Conspiracy: The Counties Issue Requests For Bids And Lexur Is The Sole Bidder*

92.     As planned and set out in the Calendar, shortly before the Fourth of July holiday, Jefferson, Ripley, Switzerland, Floyd, and Dearborn Counties issued (1) notices to bidders for the out-of-cycle rebid of cyclical reassessment services, and (2) requests for cyclical reassessment bids.  These documents are nearly identical to the draft documents authored by Davis and sent on to the Counties.

93.     As the masterminds of the Rebid Conspiracy, Defendants had of course begun to assemble their bid proposals before the requests for bids had been issued or even finalized.  For example, on July 1, 2020, Lexur confirmed to the Floyd County Assessor that it had started working on its bid despite the fact that Floyd County had not yet released its requests for bids.

94.     While Lexur had advance notice of the rebids (as orchestrator of the Rebid Conspiracy), however, the Counties did not provide Tyler with any advance notice of their intention to solicit bids.

95.     With no reason to be monitoring local papers for out-of-cycle bid notices on the Contracts Tyler was successfully performing for the Counties, Tyler only learned of the rebids

indirectly and, as designed, without sufficient time or context to submit bids. Indeed, bidding had already closed in two of the Counties by the time Tyler learned of the solicitations themselves.

96.   After learning of one of the rebids, Tyler naturally asked Davis, who was still responsible for many of the Counties on Tyler's behalf (and had only recently transitioned responsibility for the others to Thornsberry), if he had any idea that they were planning to rebid. Davis denied any such knowledge, despite the fact that it is now clear that he personally authored the notices and requests for bids themselves. As noted above, Defendants encouraged Davis to deny any knowledge of the Rebid Conspiracy if confronted by Tyler.

97.   Davis's deceit on Lexur's behalf further delayed Tyler's confirmation that the rebid process was underway, but Tyler's concerns regarding the state of the Contracts continued. Tyler contacted the Counties directly to inquire as to what was going on (through someone other than Davis, the typical point of contact for Tyler on those Counties). The Counties (except for Dearborn County) ignored Tyler's inquiries. Upon information and belief, Defendants, as well as Davis and/or Thornsberry, encouraged the Counties not to respond to Tyler.

98.   Depending on the County, bids were due on different dates during the first week of July, all coinciding with the Calendar's identification of July 6, 2020 as the model deadline to "Submit All Bids."

99.   With the timing so carefully planned to eliminate any competition, Lexur was the sole bidder for each of the cyclical reassessment contracts rebid by the Counties.

100.   On July 6, 2020, the very day the Calendar identifies as the deadline for bid submissions, Davis resigned from Tyler. His resignation letter, shared with and vetted by Defendants, indicated that he intended to retire, and made no mention of Lexur — another lie to Tyler encouraged and supported by Defendants.

101.    At the time of Davis's resignation, it was of course Defendants' intention that Davis would start working for Lexur in the near future.

c.    ***Executing The Rebid Conspiracy: Jefferson, Ripley, And Switzerland Counties Enter Into New Contracts With Lexur And Terminate Their 2017 Tyler Contracts Using Defendants' Draft Termination Notice***

102.    Switzerland, Jefferson, and Ripley Counties held Board of Commissioners meeting on July 6, 2020; July 9, 2020; and July 13, 2020, respectively.  These are the same dates identified on the Calendar.

103.    During each of these meetings, the respective County Board of Commissioners approved the termination of each of those County's 2017 Tyler Contracts, and further approved entering into a new cyclical reassessment contracts with Lexur.

104.    This, of course, was a foregone conclusion because Lexur was the only bidder by design of the Rebid Conspiracy and, armed with Tyler's trade secrets and plans to take over Tyler's own staff (recruited with misappropriated trade secrets), Lexur was able to submit bids that met the Counties' expectations and offered a lower price.

105.    On July 9, 2020, a few days before the Ripley County meeting, Davis (through his personal email address) and the Ripley County Assessor exchanged emails regarding use of the Draft Termination Notice to terminate Tyler's Contract with Ripley County.  In the email exchange, the Ripley County Assessor asked Davis for his advice on the Draft Termination Notice's language.  In response, Davis — having just resigned from Tyler and now working overtly with and in concert with Defendants — proposed the following language: "All activities currently underway are to cease immediately and a final bill for services performed prior to date of this notice is to be issued within 30 days."

106.     Upon information and belief, Davis vetted this language with Defendants and Defendants knew that use of such language would be in breach of the Contracts, which required the Counties to provide notice of termination "at least thirty days prior to the termination effective date."  Then, until the "termination effective date," Tyler was entitled to continue rendering its services.

107.     Ultimately, Davis's proposed language was included word-for-word in the Ripley County termination notice that was sent to Tyler.  A true and accurate copy of the July 9, 2020 email exchange between Davis and the Ripley County Assessor is attached as Exhibit B.

108.     After learning that the Switzerland, Jefferson, and Ripley County Board of Commissioners had granted contracts to Lexur, Tyler sent letters to each of those Counties on July 15, 2020, protesting the issuance of what were effectively no-bid contracts.

109.     None of those Counties substantively responded to Tyler's letters and each of them instead sent letters to Tyler purportedly terminating for convenience their respective contracts with Tyler.  True and accurate copies of the Jefferson County Termination Notice, Ripley County Termination Notice, and Switzerland County Termination Notice (collectively, the "Termination Notices") are attached as Exhibits C, D, and E, respectively.

110.     The Termination Notices ultimately issued by the Counties and the Draft Termination Notice authored and circulated by and between Defendants, Davis, and Thornsberry some weeks earlier are nearly identical.  In fact, the Termination Notices and the Draft Termination Notice all include the same typographical error — the word "has" is improperly used twice in the first sentence in each notice:

**Draft Termination Notice:**

Be advised, you are hereby notified that Ripley County has, in accordance with provision 27 of the 2022 Ripley County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Jefferson County Termination Notice:**

Be advised, you are hereby notified that Jefferson County has, in accordance with provision 27 of the 2022 Jefferson County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Switzerland County Termination Notice:**

Be advised, you are hereby notified that Switzerland County has, in accordance with provision 27 of the 2022 Switzerland County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

**Ripley County Termination Notice:**

Please be advised, you are hereby notified that Ripley County Indiana has, in accordance with provision 27 of the 2022 Ripley County Reassessment Contract, has determined that it is in the county's best interest to terminate said contract in whole.

Compare Exhibit A with Exhibits C-E.  This is not a coincidence.

111.    The Jefferson County Termination Notice and Switzerland County Termination Notice are both dated July 17, 2020, despite the fact that they were signed by the relevant County assessors and commissioners earlier in July at the respective county meetings.  See Exhibits C and E.  This too comes directly from the Draft Termination Notice, which was dated July 17, 2020 (consistent with the Calendar).  See Exhibit A.

112.    The Termination Notices constitute breaches of those Counties' respective contracts with Tyler.  As a preliminary matter, the Contracts permit termination for convenience only when it would be in the "best interest" of the Counties.  Entering into new contracts with Lexur — an entity with zero experience in Indiana that was rejected in 2017 for that very reason

— based on a manipulated, surreptitious scheme is objectively not in the "best interest" of the Counties.  Tyler is an industry leader that provides high-quality services to over twenty-five Indiana counties, and had performed all of its obligations under the relevant contracts with Jefferson, Ripley, and Switzerland Counties in a satisfactory fashion.  None of these Counties had raised concerns or complaints regarding Tyler's services prior to sending the Termination Notices.

113.    To the extent that pricing is claimed by the Counties as a driving force for issuing out-of-cycle requests for bids, that does not explain why those requests for bids were issued: (i) with no prior notice to Tyler before being published in minimally circulated local papers, (ii) shortly before the Fourth of July holiday, and (iii) with a very short turnaround for bids.  All of those things *minimize* the chances of obtaining the best possible price because it was necessarily unlikely that potential bidders, such as Tyler, would have even been aware of the requests for bids in time to submit a proposal.  In other words, the timing of the requests for bids all but guaranteed that the process would not be competitive and ensure the unique success of the bidder who had orchestrated a surreptitious Rebid Conspiracy.  Such a process unequivocally is not in the Counties' best interests.

114.    Underscoring the impropriety of the Rebid Conspiracy, two of the Counties targeted by Defendants, Dearborn and Floyd, hesitated to terminate Tyler's contract and award the work to Lexur.  Dearborn County was at first pulled into Defendants' Rebid Conspiracy and issued an out-of-cycle request for bids but, on reconsideration of the circumstances surrounding its issuance thanks to Tyler's exposure of the Rebid Conspiracy, decided to issue a second request for bids.  Tyler, by then on notice that such an out-of-cycle bid was expected from Dearborn, was able to submit a bid in response to that second request (Lexur submitted another bid as well).

Ultimately, Dearborn determined not to proceed with any of the rebids and kept their Contract with Tyler.

115.    Regarding Floyd County, its Board of Commissioners meeting took place on July 21, 2020, as indicated by the Calendar. Because this was the latest of Defendants' scheduled meetings on the Calendar, and came after Davis' resignation and Tyler beginning to learn of and expose the Rebid Conspiracy, Tyler was able to send Floyd County a letter protesting the bid in advance of that meeting, laying out many of the facts contained herein. With that information, at the meeting, Floyd County's Board of Commissioners was skeptical of the circumstances surrounding the rebid process and instructed that it be taken under advisement. Floyd County ultimately determined that it would not award a contract to Lexur, and its 2017 Tyler Contract remains in effect.

116.    During this time, Defendants actively attempted to thwart and delay Tyler's access to information and attempts to address the Rebid Conspiracy. For example, in response to an Indiana Public Records Act request from Tyler to Floyd County, Fry intervened to suggest advising the County to "stall as long as possible" to give the Floyd County Commissioners time to "sign the [Lexur] contract, and send out the [Tyler] termination letter."

117.    Defendants also assisted in the drafting of correspondence to be sent by the Floyd County Assessor to Tyler in response to Tyler's protest. Specifically, Fry reviewed and provided feedback on a letter "from" the Floyd County Assessor but drafted by Davis, advising that it need to be "retype[d]" to conceal that Davis had drafted the letter.

### d.    *Various Tyler Employees Are Solicited Or Hired By Defendants As Part Of The Rebid Conspiracy*

118.    As noted above, Lexur did not have sufficient staff to service the Counties and needed to take Tyler's staff to make the Rebid Conspiracy possible. The Calendar dictated that

"All Staff" at Tyler would resign and then transition to Lexur.

119.    Tyler has employed seven full-time employees assigned to the Counties.

120.    After Defendants misappropriated Tyler's trade secret compensation strategy information, Defendants used that information to target each of those employees, attempting to hire them to work for Lexur after the Rebid Conspiracy.

121.    Fry met with a number of Tyler employees to discuss hiring those employees to continue their work in the Counties after Lexur obtained the contracts as a result of the Rebid Conspiracy.

122.    Fry and Muthard prepared offer letters for the Tyler employees, discussed benefits with those employees, and discussed potential signing bonuses if those employees joined Lexur.

123.    All of these efforts relied upon inside confidential information about Tyler compensation — information Defendants asked Davis for and received from Davis in breach of contractual and other confidentiality obligations to Tyler.

124.    For example, Fry approached at least one Tyler employee regarding an opportunity to work with Lexur on the anticipated new contracts with certain of the Counties.  Fry indicated that he expected work for certain of the Counties to be shifting from Tyler to Lexur.  Fry used information about Tyler compensation during those conversations that he could only have received through Davis and/or Thornsberry.

125.    Ultimately, as a result of the Rebid Conspiracy and specifically Lexur's misappropriation:

> a.    Davis resigned on July 6, 2020 and intended to work for Lexur immediately thereafter with the intention of serving some or all of the Counties.  Tyler expended significant business resources to address Davis's resignation.
>
> b.    Thornsberry was terminated on July 21, 2020 (following Tyler's discovery of his involvement in the Rebid Conspiracy) but had intended to resign and work for Lexur immediately thereafter with the intention of serving some

or all of the Counties.  Tyler expended significant business resources to address Thornsberry's termination.

c.      Another Tyler employee assigned to one of the Counties that temporarily terminated its 2017 Tyler Contract issued a resignation to Tyler on August 7, 2020.  Tyler confirmed that the employee's resignation was a direct result of the Rebid Conspiracy and specifically its resulting termination of the Contract on which that employee worked.  Tyler expended significant business resources to address this employee's resignation and, later, expended additional business resources to recruit and hire the employee back to Tyler given the reinstatement of the Contract.

d.      Other Tyler employees assigned to the Counties were offered jobs by Lexur, most of whom officially or unofficially accepted, even though their departure from Tyler never ultimately came to pass given Lexur's Rebid Conspiracy coming to light.

## V.      Defendants Acted Knowingly, Willfully, And With Malice.

126.    Defendants acted knowingly, willfully, and with a malicious intent to harm Tyler.

127.    Importantly, both Fry and Muthard previously worked for Tyler and were let go as part of a company reorganization.  Since then, Tyler employees and executives have experienced hostility from Fry and Muthard, exhibiting at times very strong disdain for Tyler in public settings.

128.    The egregious, blatant nature of Defendants' misconduct is strong evidence of Defendants' malicious intent.  Defendants, knowing that they were engaged in wrongful conduct, repeatedly misappropriated Tyler's trade secrets and attempted to conceal their involvement in the Rebid Conspiracy.  They even urged caution in their communications (which neither they nor Davis heeded), evincing their knowledge that what they were doing was improper.

129.    For example, Lexur and Davis scheduled a secret meeting with Tyler employees (identified as "Brie" and "Shane" in the below) in Madison, Indiana regarding the Rebid Conspiracy in an attempt to avoid Tyler witnessing such meeting.  Mr. Fry commented:

| From: | Bob Fry |
|---|---|
| Sent: | Tuesday, July 14, 2020 7:20 AM CDT |
| To: | Jim Davis |
| Subject: | Re: Wednesday Madison Meeting |

Jim,  Thanks for finding this place, I really doubt that anybody from Tyler would see us there. We are planning on meeting Brie at 11:00 and Shane around 12:30 if you want to join us around 1:00?  Thanks Bob

Sent from my iPhone

130.   As another example, Fry warned Davis that a letter Davis had drafted for the Floyd County Assessor to send to Tyler showed Davis as the author.  Fry suggested that the Floyd County Assessor should "retype" the letter in an apparent attempt to hide Defendants involvement:

| From: | jdavisdsl |
|---|---|
| Sent: | Thursday, July 16, 2020 3:18 PM CDT |
| To: | Bob Fry |
| Subject: | RE: Public Information Act Records Request Regarding Documents Relating Thito Cyclical Reassessment Services |

Will do.

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Bob Fry <bfry@lexurappraisal.com>
Date: 7/16/20 1:53 PM (GMT-05:00)
To: Jim Davis <jdavisdsl@frontier.com>
Subject: RE: Public Information Act Records Request Regarding Documents Relating Thito Cyclical Reassessment Services

Jim,  If Mr. Sinks uses your letter, make sure he retypes it as this shows you as the author.  I am sure you have already covered that, but I just want to be very careful with these guys.

Bob

131.   Discovery has also confirmed Defendants' animosity towards Tyler.  For instance, Fry suggested a tactic for "stall[ing Tyler's Floyd County Indiana Public Records Act request] as

long as possible" to give the Floyd County Commissioners time to "sign the [Lexur] contract, and send out the [Tyler] termination letter."

132.    On another occasion, Fry circulated a video link to Lexur employees for a Jefferson County Commissioners' meeting where Defendants anticipated the commissioners terminating Tyler's contract and entering into a new contract with Lexur.  Mr. Fry commented:

| From: | Bob Fry |
| Sent: | Friday, July 10, 2020 10:50 AM CDT |
| To: | Dan Muthard; Randy Robillard; Nate Knopp; Jennifer Bippus |
| Subject: | FW: Jefferson Commissioner's Meeting 7/9/2020 |

Make sure you have some cheese to go with the wine for the Tyler boys.

http://vimeo.com/showcase/3465567

## VI.    Defendants' Unlawful Rebid Conspiracy Has Harmed Tyler.

133.    Defendants' scheme and tortious activities caused Tyler to expend substantial resources and strained Tyler's relationships with the Counties.

134.    Upon discovering the nature of Defendants' conduct, Tyler was forced to expend significant resources to investigate and to hire counsel to protest Lexur's bids with each of these Counties, which included invoking the dispute resolution processes set out in the Contracts.

135.    Davis and Thornsberry acted against Tyler using Tyler's own relationships and goodwill with the Counties.  That goodwill was severely damaged by Defendants' Rebid Conspiracy.  Among other things, Tyler had to undertake somewhat aggressive measures to reach out to the Counties upon learning of the Rebid Conspiracy and urge them to review the facts and reconsider their participation in Defendants' scheme.  Those reach-outs themselves strained relationships, which Tyler had to work hard to cure upon reinstatement.

136.    Tyler was also forced to make numerous inquiries to the Counties when it initially learned of the Rebid Conspiracy, including Indiana Public Records Act requests.  Even after the Counties confirmed they would remain with Tyler, Tyler needed to devote substantial resources to repairing the damaged relationships.

137.    Tyler suffered extensive business disruption.  Resources were diverted for weeks to investigate and address the rebids and efforts to educate the Counties on the Rebid Conspiracy. Work on the Contracts that were temporarily awarded to Lexur also had to stop, and necessarily had to be made up by Tyler later, upon reinstatement.  Various employees resigned, consuming human resources and business time.

138.    Perhaps most critically, the Rebid Conspiracy resulted in Defendants' illegal possession of confidential Tyler business information and trade secrets that Defendants' used to compete unfairly against Tyler during the Rebid Conspiracy and may have been used to compete unfairly against Tyler with respect to other cyclical reassessment contracts, including contracts in Indiana for the 2022–2026 cycle currently under bid, but which can also be used in other states. Lexur remains in possession of Tyler's trade secrets and the full extent of harm by Tyler as a result of that possession is to be discovered in this action.

### COUNT I: TRADE SECRET MISAPPROPRIATION
**(Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)**
**(against all Defendants)**

139.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

140.    Defendants violated 18 U.S.C. § 1836 by misappropriating Tyler trade secrets and using those trade secrets to plan, implement, and execute the Rebid Conspiracy.

141.    The Tyler trade secrets at issue include, but are not limited to, information related to Tyler's processes for appraising new construction, annual data verification, trending, and monthly billing for the Counties; Tyler business plans; Tyler fee data; and Tyler compensation and salary strategy information.

142.    Tyler uses the above-detailed trade secrets in interstate commerce, namely in the provision of reassessment services directed into Indiana and other states.

143.    The above-detailed trade secrets are not generally known or readily ascertainable by others, and have substantial value to competitors entering or operating in the property reassessment industry.  For example, Defendants used Tyler's trade secrets to obtain cyclical reassessment contracts with a number of the Counties through the Rebid Conspiracy.

144.    Tyler developed its trade secrets at substantial expense and with the input of significant time and effort.  Lexur enjoyed and continues to enjoy a significant competitive advantage in the marketplace of property reassessment services as a result of its misappropriation of Tyler's trade secrets.

145.    Tyler took reasonable steps to ensure the confidentiality of its trade secrets and protect against their disclosure.  By way of example and not limitation, Tyler requires that its employees (including the employees from whom the Defendants obtained Tyler's trade secrets) to execute confidentiality agreements and/or acknowledge confidentiality obligations prohibiting disclosure of Tyler's confidential information and trade secrets.

146.    Defendants obtained Tyler's trade secrets from Tyler employees during the course of their employment with Tyler.  Those employees were obligated to maintain the secrecy of and not disclose to others Tyler's confidential business information and trade secrets.

147.    Defendants were aware of those employees' confidentiality obligations at the time Defendants obtained the Tyler trade secrets and knew that they were obtaining the information illegally.

148.    Defendants' use of the Tyler trade secrets directly and proximately led to the initial success of the Rebid Conspiracy and specifically to Defendants' successful bids for some of the rebid Contracts.  Furthermore, upon information and belief, Defendants continue to use the trade secrets they misappropriated from Tyler to inform bids for cyclical reassessment contracts in Indiana and other states — contracts for which Tyler is also bidding.

149.    Defendants' misappropriation of Tyler's trade secrets was willful and malicious. Defendants expressed their full awareness of the confidentiality of Tyler's materials and still encouraged continued misappropriation.

150.    As a direct and proximate result of Defendants' misappropriation of Tyler's trade secrets, Tyler has been, and will continue to be, irreparably harmed, and has suffered monetary damages in an amount to be determined at trial.

151.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), Tyler is entitled to damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Tyler's trade secrets.

152.    Pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D), Tyler is entitled to exemplary damages and attorney's fees for Defendants' willful and malicious misappropriation of Tyler's trade secrets.

### COUNT II: TRADE SECRET MISAPPROPRIATION
**(Ind. Code § 24-2-3-2, *et seq.*)**
**(against all Defendants)**

153.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

154.     Defendants violated Ind. Code § 24-2-3-4 by misappropriating Tyler trade secrets and using those trade secrets to plan, implement, and execute the Rebid Conspiracy.

155.     The Tyler trade secrets at issue include, but are not limited to, information related to Tyler's processes for appraising new construction, annual data verification, trending, and monthly billing for the Counties; Tyler business plans; Tyler fee data; and Tyler compensation and salary strategy information.

156.     The above-detailed trade secrets are not generally known or readily ascertainable by others, and have substantial value to competitors entering or operating in the property reassessment industry.  For example, Defendants used Tyler's trade secrets to obtain cyclical reassessment contracts with a number of the Counties as a result of the Rebid Conspiracy.

157.     Tyler took reasonable steps to ensure the confidentiality of its trade secrets and protect against their disclosure, including by requiring its employees (including the employees from whom the Defendants obtained Tyler's trade secrets) to execute confidentiality agreements and/or acknowledge confidentiality obligations prohibiting disclosure of Tyler's confidential information and trade secrets.

158.     Defendants acquired Tyler's trade secrets through improper means.  Specifically, Defendants obtained the above-detailed trade secrets from Tyler employees in breach of their confidentiality obligations to Tyler.  Defendants were aware of those confidentiality obligations at the time that they obtained the trade secrets.

159.     Defendants' use of the Tyler trade secrets directly and proximately led to the initial success of the Rebid Conspiracy and specifically to Defendants' successful bids for some of the rebid Contracts.  Furthermore, upon information and belief, Defendants continue to use the trade

secrets they misappropriated from Tyler to inform bids for cyclical reassessment contracts in Indiana and other states — contracts for which Tyler is also bidding.

160.    Defendants' misappropriation of Tyler's trade secrets was willful and malicious. Defendants expressed their full awareness of the confidentiality of Tyler's materials and still encouraged continued misappropriation.

161.    As a direct and proximate result of Defendants' misappropriation of Tyler's trade secrets, Tyler has been, and will continue to be, irreparably harmed, and has suffered monetary damages in an amount to be determined at trial.

162.    Pursuant to Ind. Code § 24-2-3-4**,** Tyler is entitled to damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Tyler's trade secrets.

163.    Pursuant to Ind. Code § 24-2-3-4, Tyler is entitled to exemplary damages and attorney's fees for Defendants' willful and malicious misappropriation of Tyler's trade secrets.

## COUNT III: CONVERSION
### (against all Defendants)

164.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

165.    Defendants exerted unauthorized control over Tyler's property, and used that property to effectuate the Rebid Conspiracy.   In particular, Defendants obtained Tyler's intellectual property, including trade secrets and confidential business information.

166.    Tyler did not authorize Defendants to obtain and control its property, much less to use that property as part of the Rebid Conspiracy and to interfere with Tyler's Contracts and compete against Tyler for other contracts.

167.    As a result of the Defendants' unauthorized control of Tyler's property, Tyler has been and will continue to be damaged in an amount to be proven at trial.

## COUNT IV: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against all Defendants)

168.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

169.    Defendants aided and abetted Davis and Thornsberry in breaching their fiduciary duties of loyalty to Tyler.

170.    At all relevant times, Davis and Thornsberry were employees of Tyler.

171.    Defendants were aware that Davis and Thornsberry were Tyler employees, and in fact sought them out specifically because they were Tyler employees with Tyler goodwill and relationships with the Counties.

172.    As Tyler employees, Davis and Thornsberry owed a fiduciary duty of loyalty to Tyler.  The duty of loyalty prohibited Davis and Thornsberry from actively and directly competing against Tyler, or improperly using or disclosing Tyler's confidential business information or trade secrets.

173.    Defendants were aware that, as Tyler employees, Davis and Thornsberry owed a fiduciary duty of loyalty to Tyler.

174.    Davis and Thornsberry breached their fiduciary duty of loyalty to Tyler by, among other things, actively planning and participating in the Rebid Conspiracy, sharing Tyler confidential information and trade secrets to be used in the Rebid Conspiracy with Defendants, and assisting in Defendants' attempts to hire Tyler employees to continue their reassessment work with Lexur.

175.    Defendants knowingly and substantially assisted Davis and Thornsberry in breaching their fiduciary duties by, among other things, recruiting Davis and Thornsberry to participate in and take lead roles undercover as part of the Rebid Conspiracy, soliciting Davis and

Thornsberry to steal Tyler trade secret information for Defendants' use in the Rebid Conspiracy, and encouraging Davis and/or Thornsberry to lie to Tyler about what was going on.

176.    Defendants were aware of their role in Davis's and Thornsberry's breaches of their fiduciary duties at the time of assisting the breaches.  Additionally, Defendants knowingly and intentionally joined Davis and Thornsberry in enterprises constituting breaches of their fiduciary duties, i.e., carrying out the Rebid Conspiracy and using Tyler's confidential business information and trade secrets (among other things).

177.    As a result of Defendants' knowing and substantial assistance to Davis and Thornsberry in breaching their fiduciary duties, Tyler has been and will continue to be damaged in an amount to be determined at trial.

## COUNT V: TORTIOUS INTERFERENCE WITH CONTRACT
### (against all Defendants)

178.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

179.    At all relevant times, Tyler had contractual relationships with the Counties.  As discussed above, Tyler entered into cyclical reassessment contracts with the Counties for the time period of 2018–2022, i.e. the 2017 Tyler Contracts.

180.    At all relevant times, Defendants had actual knowledge of the 2017 Tyler Contracts. During their time as Tyler employees, Davis and Thornsberry were assigned to work with the Counties precisely under those Contracts.  Defendants solicited from Davis and Thornsberry their knowledge of the 2017 Tyler Contracts and Tyler's performance thereunder in connection with the Rebid Conspiracy.  Also, as a regional competitor, Lexur knew that Tyler was the current service provider for the Counties as to the services for which it was itself bidding. Moreover, the 2017 Tyler Contracts are publicly available documents.

181.   Defendants knowingly, wrongfully, intentionally, maliciously, and tortiously interfered with Tyler's contractual relationships with the Counties without justification and through improper means, including by misappropriating Tyler confidential business information and trade secrets and using that misappropriated information to induce the Counties to breach their contracts with Tyler and to bid for the Contracts, as well as aiding and abetting Davis and Thornsberry's breach of their fiduciary duties.

182.   Defendants' interference with the 2017 Tyler Contracts was malicious and specifically directed to the injury and damage of Tyler, as described above.  Such intent is further evidence of an absence of justification for Defendants' actions.

183.   Defendants were aware of the impropriety of their actions, and attempted at all times to maintain the secrecy of those actions by, among other things, selecting meeting locations where they would not be seen, attempting to hide communications by using private email accounts, disguising Davis and Thornsberry's involvement in the Rebid Conspiracy, and attempting to delay and obstruct Tyler's attempts to remedy the wrongs caused by the Rebid Conspiracy.

184.   In addition to the above, the social interests in preserving free competition, protecting confidential business information and trade secrets, and ensuring employees comply with their fiduciary duty of loyalty further evidence an absence of justification for Defendants' actions.

185.   As a direct and proximate result of Defendants' improper actions, Tyler's contractual relationships with the Counties have been irreparably damaged, and Tyler has suffered monetary damages in an amount to be proven at trial.

## COUNT VI: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (against all Defendants)

186.    Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

187.    At all relevant times, Tyler had business relationships with the Counties.

188.    At all relevant times, Defendants had actual knowledge of the business relationships between the Counties and Tyler at least because Lexur had bid on some of the Contracts itself, and those same Contracts were publicly available documents.  During their time as Tyler employees, Davis and Thornsberry were assigned to work with the Counties.  Defendants solicited information from Davis and Thornsberry about Tyler's business relationships with the Counties in connection with the Rebid Conspiracy.  Also, as a regional competitor, Lexur knew that Tyler was the current service provider for the Counties as to the services for which it was itself bidding.

189.    Defendants knowingly, wrongfully, intentionally, maliciously, and tortiously interfered with Tyler's business relationships with the Counties without justification and through improper means, including by misappropriating Tyler confidential business information and trade secrets and using that misappropriated information to interfere with Tyler's business relationships with the Counties, as well as aiding and abetting Davis and Thornsberry's breach of their fiduciary duties.

190.    Defendants' interference with Tyler's business relationships with the Counties was malicious and specifically directed to the injury and damage of Tyler, as described above.  Such intent is further evidence of an absence of justification for Defendants' actions.

191.     Defendants' tortious interference with Tyler's business relationships with the Counties involved illegal action including, but not limited to violations of Indiana federal and Indiana trade secret law.

192.     Defendants were aware of the impropriety of their actions, and attempted at all times to maintain the secrecy of those actions by, among other things, selecting meeting locations where they would not be seen, attempting to hide communications by using private email accounts, disguising Davis and Thornsberry's involvement in the Rebid Conspiracy, and attempting to delay and obstruct Tyler's attempts to remedy the wrongs caused by the Rebid Conspiracy.

193.     In addition to the above, the social interests in preserving free competition, protecting confidential business information and trade secrets, and ensuring employees comply with their fiduciary duty of loyalty further evidence an absence of justification for Defendants' actions.

194.     As a direct and proximate result of Defendants' improper actions, Tyler's business relationships with the Counties have been irreparably damaged, and Tyler has suffered monetary damages in an amount to be proven at trial.

## COUNT VII: CIVIL CONSPIRACY
### (against all Defendants)

195.     Tyler realleges and incorporates by reference the allegations contained in each of the preceding paragraphs of this Amended Complaint as if set forth herein.

196.     Defendants intentionally engaged in concerted action to tortiously interfere with Tyler's contractual and business relationships, to violate federal and Indiana trade secret laws, and commit conversion of Tyler's property.

197.     In particular, Defendants encouraged, assisted, and supported a conspiracy for the misappropriation of Tyler goodwill and trade secrets in order to convince the Counties to issue

out-of-cycle requests for bids with an unusually short turnaround time and minimal notice designed to eliminate competition, leading to the intended termination of the Counties' 2018–2022 cyclical reassessment contracts with Tyler, and awarding of the cyclical reassessment contracts to Lexur as the sole bidder, to be performed by Tyler employees that Lexur was to take over through use of the misappropriated Tyler materials.

198.   Defendants also encouraged, assisted, and supported a conspiracy for Tyler employees to obtain Tyler confidential business information, trade secrets, and other information and provide it to Defendants for use in the Rebid Conspiracy.

199.   As a direct and proximate result of Defendants' unlawful common plan, Tyler has been, and will continue to be, irreparably harmed, and has sustained monetary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Tyler respectfully requests that the Court:

A.      Enter judgment in Tyler's favor and against Defendants on all counts of this complaint;

B.      Award Tyler actual, compensatory, consequential, special, punitive, and exemplary damages in an amount to be determined at trial;

C.      Enjoin Defendants from accessing, using, disclosing, reproducing, selling or otherwise commercializing Tyler's confidential information and trade secrets;

D.      Order Defendants to return to Tyler any Tyler confidential information or trade secrets within Defendants' possession, custody, or control;

E.      Award Tyler pre and post judgment interest in an amount to be proven at trial;

F.      Award Tyler the costs it incurs in connection with this proceeding and reasonable attorney's fees in an amount to be proven at trial; and

G.      Grant Tyler such other relief as this Court deems just and proper.

## JURY DEMAND

Tyler demands a trial by jury on all claims so triable.

Respectfully submitted,

**TYLER TECHNOLOGIES, INC.**

By its attorneys,

*/s/ Ann O'Connor McCready*

Ann O'Connor McCready (Ind. Atty. No. 32836-53)
amccready@taftlaw.com
Vivek R. Hadley (Ind. Atty. No. 32620-53)
vhadley@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Telephone: (317) 713-3500
Fax: (317) 713-3699

Jennifer J. Nagle (Mass. Bar No. 669325)
(*pro hac vice*)
jennifer.nagle@klgates.com
Michael R. Creta (Mass. Bar No. 693340)
(*pro hac vice*)
michael.creta@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: (617) 261-3100
Fax: (617) 261-3175

Dated: July 9, 2021

## CERTIFICATE OF SERVICE

I certify that on July 9, 2021, a copy of the foregoing Amended Complaint was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that on July 9, 2021, a copy of the foregoing Amended Complaint was sent via U.S. mail, postage prepaid, on:

Daniel Muthard
914 Foxtail Circle
Tipp City, OH 45371

*/s/ Ann O'Connor McCready*